**Raymond J. DONOVAN, Successor to Ray Marshall, Secretary of Labor, Plaintiff,**

and

**Southern Nevada Culinary and Bartenders Pension Trust, Involuntary Plaintiff,**

v.

**Ben SCHMOUTEY, et al., Defendants.**

**No. CV–LV 77–47 RDF.**

United States District Court, D. Nevada.

May 15, 1984.

As Amended Aug. 6, 1984.

Lamond Mills, U.S. Atty., Las Vegas, Nev., John Hardin Young, Joseph R. Reyna, Paula J. Page, David L. Peña, Willie M. Alexander, Daly D.E. Temchine, Peter B. Dolan, Linda S. Leonard, Nancy S. Hyde, Patrick Hyde, U.S. Department of Labor, Washington, D.C., for plaintiff Donovan.

John J. Reynolds, Chicago, Ill., Kevin C. Efroymson, Las Vegas, Nev., Seyfarth, Shaw, Fairweather & Geraldson, Mitchel D. Whitehead, Bruce R. Bailey, Mary E. McInerny, Los Angeles, Cal., Iverson, Yoakum, Papiano & Hatch, John A. Slezak, Donald M. Robbins, Neil Papiano, F.B. Yoakum, Jr., Deborah M. Nesset, Los Angeles, Cal., for involuntary plaintiff and cross defendant Southern Nevada Culinary and Bartenders Trust.

Thomas L. Pursel, Las Vegas, Nev., for defendant Ben Schmoutey.

William Singleton, Rene C. Arceneaux, Mark C. Scott, Jr., Beckley, Singleton, DeLanoy & Jemison, Las Vegas, Nev., for defendants and third-party plaintiffs Richard P. Crane, Jr., Bernard W. Menke & Harry R. Stang.

Lewis, D'Amato, Brisbois & Bisgaard, Christopher P. Bisgaard, Robert F. Lewis, Roy M. Brisbois, Alan M. Greenberg,

Charles K. Wake, Los Angeles, Cal., and Cromer, Barker, Michaelson, Gillock & Rawlings, Las Vegas, Nev., for defendant/cross claimant and third party plaintiff Harry Rugg.

Houston, Moran & Kennedy, Las Vegas, Nev., and Lewis, D'Amato, Brisbois & Bisgaard, Associated 8/13/79, Los Angeles, Cal., for defendant/cross claimant and third party plaintiff Herbert Tobman.

John O'Reilly, Gloria Sanchez, Peter J. Stutsman, Las Vegas, Nev., for defendant Estate of Al Bramlet.

Cordell Siegel, Andrew F. Puzder, James L. Zemelman, Anthony A. Zmaila, John L. Boeger, St. Louis, Mo., Bilbray, Carelli & Miller, Las Vegas, Nev., William E. Crockett, Cordell Siegel, St. Louis, Mo., E. Michael Murphy, Clayton, Mo., Pierre E. Mailloux, Washington, D.C., Bernard J. Mellman, St. Louis, Mo., Anthony A. Zmaila, St. Louis, Mo., Andrew F. Puzder, Stolar, Heitzmann, Eder, Seigel & Harris, St. Louis, Mo., E. Michael Murphy, Clayton, Mo., for defendant and defendants in intervention Morris Shenker; I.J.K. Nevada, Inc., Murrieta Hot Springs & S & F Corp.

Lee A. Warsaw, Los Angeles, Cal., for defendant and defendant in intervention Sierra Charter Corp.

A. William Maupin, Las Vegas, Nev., for defendant and third party defendant Pacific Intern. Brokers, Ltd.

James Pico, Las Vegas, Nev., for third party defendants Underwriters at Lloyd's, London & Professional Indem. Agency, Inc. (also referred to as Professional Indemnity, Inc.).

Bancroft, Avery & McAlister, Michele D. Robertson, Janet F. Stansby, San Francisco, Cal., Leonard I. Gang, Las Vegas, Nev., for third party plaintiff and third party defendant Barbanell Associates.

Keith Edwards, Las Vegas, Nev., Parkinson & Wolf, Marc L. Sallus, Lisa Weinberg, Gordon J. Calhoun, Walter S. Weiss, Roger A. Parkinson, David Lyons, Barbara M. Rubin, Girard Fisher, William Z. Elliott, Erin M. Mulcahy, Allan H. Cutler, Jeffrey

M. Loeb, Fred J. Marcus, Linda C.J. Miller, Brian R. Strange, Suzanne Elkins, Mark F. Marnell, David Herriford, Los Angeles, Cal., for third party defendants Roland C. Davis, Davis, Cowell & Bowe, I.R. Ashleman, II, and Ashleman & Sabbath.

Herbert L. Roth, Los Angeles, Cal., Mitchell, Silberberg & Knupp, Jean P. Nogues, Charles F. Eick, Richard S. Hessenius, Daniel A. Weber, Los Angeles, Cal., Richard Mainland, Los Angeles, Cal., Earl Monsey, Rogers, Monsey, Woodbury, Brown & Berggreen, Las Vegas, Nev., for Substituted Investment Manager and Plaintiff/intervenor Thomas L. Karsten Assoc.

Andrew S. Brignone, Lionel Sawyer & Collins, Las Vegas, Nev., for third party defendants Laventhol and Horwath.

David R. Grundy, Hibbs, Roberts & Lemons, Reno, Nev., Reuben & Proctor, John A. Krivicich, Chicago, Ill., for third party defendant Lake Shore Nat. Bank.

Goodman, Oshins, Brown & Singer, Kirby R. Wells, Las Vegas, Nev., for deponent Merlin Jones, CPA.

ROGER D. FOLEY, District Judge.

## FINDINGS OF FACTS

### I. PARTIES

1. On March 30, 1977, the Secretary of Labor (Secretary) filed a complaint in the United States District Court, District of Nevada, naming the Southern Nevada Culinary and Bartenders Pension Trust (Pension Trust) as an involuntary plaintiff, certain of the Pension Trust's trustees as defendants, and Morris A. Shenker (Shenker) and certain companies owned or controlled by him as defendants. On December 14, 1982, the Secretary amended his complaint.

The original and amended complaints of the Secretary arise under the Employee Retirement Income Security Act of 1974 (ERISA), Pub.L. No. 93–406, 88 Stat. 829, generally codified as amended in 29 U.S.C. secs. 1001–1381 (1976 & Supp. V 1981) and were brought by the Secretary to enjoin acts and practices of the defendants which violate title I of ERISA and to obtain other equitable relief to redress violations and enforce the provisions of that title. The Secretary specifically alleged the following claims:

a. The defendant trustees breached their fiduciary obligations with respect to the Pension Trust and its participants and beneficiaries by engaging in imprudent acts by making loans to certain Shenker defendants in violation of ERISA, 29 U.S.C. sec. 1104(a)(1)(B) (1976).

b. The defendant trustees breached their fiduciary obligations with respect to the Pension Trust and its participants and beneficiaries by failing to diversify the investments of the Pension Trust so as to minimize the risk of large losses in violation of ERISA, 29 U.S.C. sec. 1104(a)(1)(C) (1976).

c. The defendant trustees caused the Pension Trust to engage in transactions which they knew or should have known constituted a direct or indirect lending of money or extension of credit to parties in interest in violation of ERISA, 29 U.S.C. sec. 1106(a)(1)(B) (1976), by causing the Pension Trust to lend money to defendant Sierra Charter Corporation (Sierra) for the benefit of defendants I.J.K. Nevada, Inc. (I.J.K.), Murrieta Hot Springs (Murrieta), and Shenker and by extending credit to Murrieta by classifying and treating delinquent interest owed to the Pension Trust as principal on the loans made to Murrieta.

d. Defendants Shenker, I.J.K., Murrieta, Sierra, and S & F Corporation (S & F) knowingly participated in these breaches of fiduciary obligations of the defendant trustees. The Secretary requested that the court order these defendants to make restitution to the Pension Trust of all monies unlawfully received by these defendants or lost by the Pension Trust as a result of their knowing participation and also as a result of their violations of ERISA.

Prior to the commencement of the trial in this case, the Secretary, the involuntary plaintiff, and the then trustee defendants, except for Ben Schmoutey, finally settled

all claims between them. The then trustee defendants and the third party defendants, I.R. Ashleman II, Roland C. Davis, Ashleman & Sabbath, and Davis, Cowell & Bowe, likewise settled the claims between them without admitting liability for those claims. The Secretary, the involuntary plaintiff, and these third party defendants also entered into agreements, which were effectuated and memorialized in consent decrees and stipulations, that expressly provided that they shall not constitute an adjudication on the merits of any of the claims thereby finally resolved. The then trustee defendants did not participate as parties in the trial.

The evidence at trial discloses that in September of 1976 three new trustees, Richard P. Crane Jr., Harry R. Stang, and Bernard W. Menke, were appointed to the Pension Trust board of trustees. The court notes that these trustees recognized the perilous circumstances of the Pension Trust and took action, including giving of notification of said loan transactions to the Department of Labor, with the object of terminating the Pension Trust relationship with the Shenker defendants.

After investigating the actions of Crane, Stang, and Menke as trustees, the Secretary and the involuntary plaintiff entered into an agreement, which dismisses with prejudice the claims previously asserted against them in this action.

In addition to bringing the loans referred to herein to the attention of the Department of Labor, Crane, Stang, and Menke sought to investigate the legality of and to remedy the effects of the loans. Accordingly, these findings of fact and conclusions of law shall not be construed as reflecting in any manner on the conduct of Richard P. Crane Jr, Harry R. Stang, and Bernard W. Menke as fiduciaries.

At the commencement of trial, S & F Corporation and Palm Development were party defendants and counterclaimants against the Pension Trust. All claims by the Secretary, the involuntary plaintiff, S & F and Palm were finally settled prior to the conclusion of trial. No adjudication of such claims and the defenses thereto is made by the court.

The trial of the Secretary's claims against Morris A. Shenker, I.J.K. Nevada, Inc., Sierra Charter Corp., and Murrieta Hot Springs, with respect to which the following findings of fact and conclusions of law are made, do not involve an adjudication of any of the settled claims and no such adjudication has been made by the court. The following findings and conclusions are not an adjudication on the merits of the settled claims or of the defenses thereto as to the settling parties only, but are of course an adjudication on the merits as to Shenker, Sierra, and I.J.K.

2. The Secretary is a governmental officer authorized by statute to sue on behalf of a pension trust pursuant to ERISA, 29 U.S.C. sec. 1132(a)(2) (1976).

3. The Secretary was sued as a counter-defendant by Shenker and Sierra. They allege that the Secretary failed to properly investigate his claims against Shenker and that the action was merely a vendetta on the part of the Secretary to prevent Shenker corporations from obtaining monies from pension funds. These counterclaims were subsequently dismissed by the court.

4. The Culinary Workers Union Local 226 (Local 226) is a labor union that was comprised of approximately 24,000 members working in Las Vegas, Nevada, during the years 1973 through 1977. The Bartenders Union Local 165 (Local) is a labor union that was comprised of approximately 1400 to 1500 members working in Las Vegas, Nevada during the years 1973 through 1977. Locals 226 and 165 have bargained jointly with employers since before 1963.

5. The Nevada Resort Association (NRA) is an organization of employers, principally casino and hotel employers in Las Vegas, Nevada, which bargains with Locals 226 and 165 on a multiemployer basis. The NRA represents certain hotels and casinos for collective bargaining purposes. The NRA is comprised of two different groups: (1) the strip group, those properties south of Sahara, and (2) the

downtown group, those properties on Fremont Street and in the downtown area. Locals 226 and 165 have collectively bargained with the NRA since 1970.

6. Involuntary plaintiff, the Southern Nevada Culinary Workers and Bartenders Pension Trust (Pension Trust), was formally created in December 1971 by the NRA and Locals 226 and 165 for the purpose of implementing a program of pension benefits funded by the contributions from the contributing employers pursuant to collective bargaining agreements. Its principal place of business is Las Vegas, Nevada.

7. The Dunes Hotel and Casino, Inc. (Dunes) (and its predecessors) has been a member of the NRA since approximately 1970 to date and has employed members of Locals 226 and 165 at all times during those years.

8. Locals 226 and 165 entered into collective bargaining agreements with the NRA for the period of 1970 through 1973, 1973 through 1976, 1976 through 1980, and 1980 through 1984. The Dunes was a party to each of these collective bargaining agreements and made contributions on behalf of its employees to the Pension Trust pursuant to these agreements during those years, including particularly the years 1973 through 1977.

9. The Pension Trust is administered by a board of trustees consisting of three trustees representing management and three representing the unions. The management trustees are appointed by the NRA. The union trustees hold the union offices of secretary and president of the Local 226 and secretary of Local 165.

10. The trustees have exclusive management and control of the Pension Trust and their primary duties are to receive contributions from employers, oversee investment of monies, establish and determine benefits, and make other decisions affecting the Pension Trust.

11. The Pension Trust asserts standing to sue as a plaintiff under the Secretary's amended complaint pursuant to ERISA, 29 U.S.C. sec. 1132(d)(1) (1976), and seeks certain relief sought by the Secretary. The Pension Trust is designated as an involuntary plaintiff in the amended complaint.

12. The Pension Trust was sued as a counter-defendant by defendants Shenker, Sierra, and S & F.

a. Shenker alleges that the Pension Trust breached an agreement known as the Second Addendum by terminating funding to Sierra in April 1977.

b. Sierra alleges, first, that the Pension Trust breached the Second Addendum by terminating funding to Sierra in April 1977 and, second, that the Pension Trust and its investment managers mismanaged assets that had been transferred to the Pension Trust from Sierra and Shenker and thereby diminished the fair market value of those assets.

c. S & F alleges that the Pension Trust had breached a purported obligation to fully fund four notes and mortgages between Sierra and S & F and thereby damaged S & F.

d. The counterclaims filed by Sierra and Shenker against the Pension Trust were dismissed by the court pursuant to the Pension Trust's motion for directed verdict.

e. S & F dismissed its counterclaim with prejudice against the Pension Trust.

13. Upper Avenue Bank was an Illinois banking corporation which formally merged with Lake Shore National Bank in July 1981. Both Upper Avenue Bank's and Lake Shore National Bank's principal places of business at all times relevant to this action have been in the State of Illinois. On August 30, 1977, the court approved the appointment of Upper Avenue Bank (U.A.B.) as investment manager of the real estate assets of the Pension Trust. U.A.B. served continuously as investment manager through approximately May 2, 1979, when it formally resigned.

14. Thomas L. Karsten Associates (Karsten) is, and at all relevant times herein was, a corporation organized and existing under the laws of the State of California, and maintaining its offices and place of business in Los Angeles, California. On or

about April 19, 1979, the Court approved the substitution of Karsten as investment manager in place of U.A.B. Pursuant to the stipulation and order, Karsten, as investment manager of the Pension Trust, was empowered to exercise the powers, rights, and duties set forth in the stipulation, including the powers, rights and duties of investment managers as defined in ERISA, 29 U.S.C. secs. 1002(38), 1102(c)(3) (1976).

15. Karsten, as investment manager for the Pension Trust, moved to intervene in this action on behalf of the Pension Trust against defendants Sierra, Shenker, and I.J.K. This motion was granted and Karsten filed a complaint in intervention.

16. Karsten amended its complaint in intervention alleging the following on behalf of the Pension Trust:

a. breach of loan agreements and guarantees by Sierra and Shenker;

b. fraud in connection with loan agreements and guarantees by Sierra and Shenker;

c. negligent misrepresentation by Sierra and Shenker;

d. a claim for money had and received against Sierra and Shenker;

e. a claim for unjust enrichment against Sierra and Shenker;

f. a claim to enforce a promissory note against defendant Shenker;

g. a claim to enforce a promissory note against I.J.K. and Shenker; and

h. a claim for unjust enrichment against I.J.K. and Shenker.

On November 28 and 30, 1983, after trial, the jury having heard Karsten's amended complaint against Sierra and Shenker returned special verdicts in favor of Karsten. On December 1, 1983, the court entered judgment upon the jury verdicts in favor of Karsten and against Sierra in the principal sum of $28,227,304 plus interest, costs, and attorneys' fees, and against Shenker in the principal sum of $33,939,360 plus interest, costs, and attorneys' fees. The subject findings of fact,

conclusions of law, and judgment on the Secretary's amended complaint are not intended to affect the Karsten judgment in any way. However, the Pension Trust, which is the beneficiary of Karsten's and the Secretary's judgments, shall not have a double recovery against the defendants and may only collect principal and interest on said judgment once, although it may recover the fees and costs of both Karsten and the Pension Trust since it necessarily incurred and paid both in connection with this action.

17. Shenker is a defendant in the actions brought by the Secretary and Karsten and, at all times relevant to this action, was a resident of Nevada or Missouri. Shenker is an attorney who received his law degree in 1932 and formed his own law firm in the same year. He actively practiced law until 1973 or 1974 and since that time has acted as a consultant to his law firm.

18. Sierra is a defendant in the actions brought by the Secretary and Karsten. Sierra is and has been, from its inception, a corporation organized and existing under the laws of the State of Nevada. Sierra is and has been, since 1972, a company involved in real estate development and retail sales of lots.

19. Murrieta is a defendant in the action brought by the Secretary, and is and was at all relevant times a California corporation, with its principal place of business in Riverside County, California. Murrieta was involved in real estate development, the sale of mobile home lots, the sale of condominiums and sites, and the operation of Murrieta Spa and related facilities. A bankruptcy proceeding was filed against Murrieta and on April 9, 1979, Murrieta was adjudicated a bankrupt. At all times since March 1978, Murrieta has remained subject to these bankruptcy proceedings.

20. I.J.K. is a defendant in the actions brought by the Secretary and Karsten, and at all relevant times was a corporation organized and existing under the laws of the State of Nevada. I.J.K. was originally formed to hold stock of the Dunes.

21. S & F was a defendant in the action brought by the Secretary and at all times was a corporation organized and existing under the laws of the state of Delaware. S & F is and was a company involved in land sales and the development of real property in the state of New Mexico. Palm Development Corporation (Palm) is and was at all relevant times a wholly-owned subsidiary of S & F. During the course of the trial, the Secretary and S & F entered into a settlement agreement disposing of the Secretary's claims against S & F.

22. Richard Crane, Bernard Menke, Harry Rugg, Ben Schmoutey, Jack Stafford, Harry Stang, Herbert Tobman and the estate of Al Bramlet (defendant trustees) were defendants in the action brought by the Secretary:

a. Defendant Stafford has served as a union trustee of the Pension Trust from approximately December 1, 1971, and continues to so serve.

b. Defendant Schmoutey served as a union trustee of the Pension Trust from approximately December 1, 1971, until June 1981.

c. Defendant Crane has served as a management trustee of the Pension Trust from approximately September 1976 and continues to so serve.

d. Defendant Rugg served as a management trustee of the Pension Trust from approximately December 1, 1971, until September 1976.

e. Defendant Tobman served as a management trustee of the Pension Trust from on or about June or July 1973 until September 1976.

f. Defendant Estate of Al Bramlet is the estate of a deceased union trustee who served in that capacity from approximately December 1, 1971 until he died on or after February 24, 1977.[1]

23. The defendant trustees, with the exception of Ben Schmoutey, entered into settlement agreements on or about January 31, 1983, with all pertinent parties in this action and are no longer parties to the proceedings. Defendant trustee Schmoutey remains a defendant in the Secretary's action but the Secretary seeks only injunctive relief against him.

24. Leo Lewis was a management trustee of the Pension Trust from approximately December 1, 1971, through his resignation as a trustee on March 26, 1973. Lewis voted against making the $2 million loan to Murrieta and his resignation was due to his disagreement with the decision to make this loan.

25. Keith Ashworth was a management trustee of the Pension Trust from on or about December 1, 1971, through his resignation as a trustee on January 2, 1974. Ashworth voted against making the $5 million loan to Murrieta and his resignation was due to his disagreement with the decision to make this loan.

26. Ivan R. Ashleman III became an attorney for the Pension Trust in the Fall of 1975. Ashleman ceased his representation of the Pension Trust in 1979. Ashleman was also sued by various defendant trustees in this action, but these claims were settled with all relevant parties along with the claims against the defendant trustees on or about January 31, 1983.

27. Sidney Wyman was professional gambler who, with his close friend and partner Charles Rich, held a controlling interest in the Dunes commencing in the early 1960's. He sold his interest in or about 1972, but remained as a consultant through all changes in ownership, including Shenker's acquisition of the controlling interest in the Dunes, until his death in about 1979. Shenker considered Wyman to be the key man at the Dunes. Wyman was a legal client of Shenker continuously from the early 1930's to his death. Wyman introduced Shenker to Al Bramlet, the chairman of the Pension Trust and the man whom Shenker considered responsible for making the loans to Murrieta and Sierra.

---

1. For general references to the tenure of the other trustees, see Lewis, 20 Trial Transcript at 1881–82; Plaintiff's Exhibit Nos. A–18, A–24, A–26–A.

28. Charles Rich was a professional gambler who, with his close friend and partner Wyman, held controlling interest in the Dunes commencing in the early 1960's. He sold his interest in or about 1972, but remained as a consultant through all changes in ownership, including Shenker's acquisition of the controlling interest in the Dunes, until approximately May 1983. Rich was also a long-time legal client of Shenker.

29. Irvin J. Kahn was involved in real estate development primarily in the state of California. All of Kahn's business activities, corporations, and business entities were conducted through the Irvin J. Kahn Organization (Kahn Organization), which he solely owned. Kahn also had an ownership interest during 1972 and 1973 in the Dunes through I.J.K. Shenker represented Kahn as a lawyer and introduced him to the Central State, Southeast, and Southwest Areas Pension Fund, from which Kahn's companies, including Peansquitos, Inc., received more than $150 million in loans. Shenker and Kahn had a history of business relationships together, including their joint stock ownership of Murrieta and I.J.K., until Kahn's death on September 10, 1973. Shenker acquired 100 percent ownership of Murrieta and I.J.K. in the early part of 1974 through the settlement of Kahn's Estate.

30. Kenneth Unruh was employed by Kahn from December 1962 through Kahn's death in September 1973. Unruh acted as controller of the Kahn Organization and eventually became treasurer of the Kahn Organization. After Kahn's death, Shenker hired Unruh in October 1975 to act solely as Shenker's personal consultant or "supercontroller" of his enterprises. In January 1976 Unruh began working as a consultant to Shenker and became the president of Sierra and a member of its board of directors in May 1976. From May 1976 up to October 1976 Unruh was compensated both by Shenker and Sierra.

31. Stanley Franklin was president and a director of Sierra from its inception in May 1972 through May 1976, when he terminated his relationship with Sierra.

32. Andrew Stevens, through his company Great Western Properties, was hired as a broker for Sierra in June of 1974. Stevens became vice-president of sales and a member of the board of directors of Sierra at the same time. Stevens' additional responsibilities included developing a program to sell properties at Murrieta. His relationship with Sierra terminated in June or July 1976.

33. John Pilkington is a lawyer and close friend of Shenker. He clerked for Shenker's law firm during the summers of 1964 and 1965. In 1972 he began to represent Shenker as an attorney and he formed Sierra in May 1972. From Sierra's inception up through 1980 or 1981 he served as corporate counsel, a member of the board of directors, and secretary of Sierra.

34. D.W. Falls sold certain assets of his company, Falls Land and Development Corporation (FLDC) to S & F on March 27, 1975. He has served as president and a member of the board of directors of S & F and Palm from March 27, 1975 through the date of his testimony in this case.

35. M & R Investment Company, Inc. (M & R Investment), a Nevada Corporation with its principal place of business in Las Vegas, Nevada, owned and operated the Dunes Hotel and Casino in Las Vegas at all times from January 1, 1975, through March 30, 1977.

36. M & R Corporation (M & R), a Delaware corporation, owned 100 percent of the issued and outstanding shares of voting stock of M & R Investment at all times from January 1, 1975 through March 30, 1977.

37. Continental Connector Corporation (Connector), a New York corporation, owned 100 percent of the issued and outstanding shares of voting stock of M & R at all times from January 1, 1975, through March 30, 1977.

38. At all times from January 1, 1975, through March 30, 1977, M & R Investment was an employer of approximately 825 em-

ployees who were participants in the Pension Trust. M & R Investment made contributions at the rates of 25 cents to 35 cents per work hour on behalf of these 825 employees to the Pension Trust during this time period.

39. Shenker was chairman of the board of directors of M & R Investment from March 3, 1975, through March 30, 1977.

40. Shenker was a director of Connector from March 3, 1975, through March 30, 1977.

41. Shenker owned 100 percent of the issued and outstanding shares of voting stock of I.J.K. at all times from January 1, 1975, through March 30, 1977.

42. I.J.K. owned approximately 36 percent of the issued and outstanding shares of voting stock of Connector at all times from January 1, 1975 through March 30, 1977.

43. Shenker indirectly owned 40 percent or more of Connector and was thereby the largest and controlling shareholder of Connector (through individual and family holdings and his direct ownership of 100 percent of the voting stock of I.J.K.) at all times from January 1, 1975, through March 30, 1977.

44. Murrieta was a joint venturer with Continental California Corporation (California). This joint venture was in force at all times from January 1, 1975, through March 30, 1977, and provided, in part, that any profits earned by the joint venture would be distributed 50 percent each to Murrieta and California.

45. Connector owned 100 percent of the voting stock of California at all times from January 1, 1975, through March 30, 1977.

46. At all times during the period of about June 1974 through March 30, 1977, Shenker owned 50 percent of the issued and outstanding shares of common stock of Sierra (its only class of voting stock). The remaining 50 percent was equally owned by his son, M. Arthur Shenker, and his daughter, Patricia Ann Shenker.

47. At all times from about April 1974 through March 30, 1977, Shenker owned 100 percent of the issued and outstanding shares of Murrieta's common stock (Murrieta's only class of voting stock).

48. Shenker together with his wife and two children was the owner of 100 percent of the issued and outstanding voting stock of S & F at all times from March 27, 1975, through at least March 30, 1977.

## II. LOAN AGREEMENTS

### A. The $2 Million Loan to Murrieta

49. On February 9 and March 24, 1973, Shenker, then 50 percent owner of Murrieta, made loan presentations to the trustees of the Pension Trust in which he requested a $2 million loan for Murrieta.

50. During the presentations Shenker said that Murrieta would use the $2 million loan for Murrieta's business and specifically to develop and sell the part of Murrieta which would be collateral for the Pension Trust's loan.

51. On March 24, 1973, after the loan presentations by Shenker, the Pension Trust entered into an agreement to loan Murrieta the sum of $2 million (hereinafter referred to as the $2 million loan).

52. In conjunction with the $2 million loan, Murrieta executed a promissory note in favor of the Pension Trust for the principal sum of $2 million, which note provided that interest would be paid monthly for five years from March 26, 1973, at the rate of 8 percent or 1½ percent above the prime rate of Manufacturers Hanover Trust Company. The note further provided for monthly payments of $16,730 commencing five years after March 26, 1973, and for the entire unpaid balance together with interest thereon to be due and payable ten years after March 26, 1973.

53. The note further provided that should default be made in any installment of principal or interest, the whole sum of principal and interest could immediately become due and payable at the option of the Pension Trust.

54. Murrieta executed a deed of trust in favor of the Pension Trust on 163 mobile

home lots and 46 R–3 lots at Murrieta as security for the $2 million loan.

55. Murrieta represented and warranted in the $2 million loan agreement that the fair market value of the collateral securing the loan exceeded $3 million.

56. Shenker provided the Pension Trust with an appraisal representing that the fair market value of the Pension Trust's collateral for the $2 million loan was $3,150,000, assuming the collateral was developed and sold within one year of that time.

57. The Pension Trust disbursed $2 million to Murrieta from March 26, 1973, through June 6, 1973.

58. Of the $2 million Murrieta received from the Pension Trust, Murrieta applied $600,000 to partially repay prior loans from the Pipefitters Pension Fund, $400,000 to repay a loan from the Valley Bank to an affiliate, West Loma Development Company, and $200,000 to partially repay a loan from Valley Bank to Murrieta.

59. Murrieta did not apply any of the proceeds from the $2 million loan to develop or sell the Pension Trust's collateral.

60. As of December 1, 1975, Murrieta had partially developed but not sold any of the Pension Trust's collateral under the $2 million loan agreement.

**B. The $5 Million Loan to Murrieta**

61. On June 8, 1973, Shenker's wife, Lillian, then president of Murrieta, applied in writing on behalf of Murrieta to the Pension Trust trustees for a $5 million loan.

62. Lillian Shenker's written loan application represented that the proceeds of the $5 million loan would be used for the further development of Murrieta.

63. On July 23, 1973, Shenker, then 50 percent owner of Murrieta, and his wife, Lillian, made a loan presentation to the Pension Trust trustees in which Shenker requested a $5 million loan for Murrieta.

64. During the presentation Shenker stated that Murrieta would use the $5 million loan for Murrieta's business and spe-cifically to develop and sell the part of Murrieta which would be collateral for the loan.

65. On July 30, 1973, after the loan presentation by the Shenkers, the Pension Trust entered into an agreement to loan Murrieta $5 million.

66. In conjunction with the $5 million loan, Murrieta executed a promissory note in favor of the Pension Trust in the principal amount of $5 million with interest due monthly at the rate of 9 percent per annum for 5 years commencing August 30, 1973. The note further required Murrieta to make monthly payments, commencing 5 years after the last advancement under the loan, of $44,990 for 5 subsequent years and to pay the entire unpaid balance, together with interest, 10 years from the date of the last advancement.

67. The note provided that should default be made in any installment of principal or interest, the whole sum of principal and interest could become immediately due at the option of the Pension Trust.

68. Murrieta executed a deed of trust in favor of the Pension Trust on approximately 560 acres of undeveloped real property at Murrieta commonly known as the Yoder parcel, which constituted the collateral securing the $5 million loan.

69. Murrieta represented and warranted in the loan agreement that the fair market value of this collateral was in excess of $7,500,000.

70. Shenker submitted an appraisal of the Yoder parcel to the Pension Trust trustees prior to July 30, 1973. The appraisal represented that the Yoder parcel had a fair market value of $7,702,000, assuming the parcel was developed and sold in accordance with a specific plan for mobile home, condominium, R–3, and commercial usage with estimated development and selling costs of $14,390,045.

71. The Pension Trust disbursed $5 million to Murrieta pursuant to the $5 million loan agreement from July 30, 1973, through March 11, 1974.

72. Of the $5 million lent by the Pension Trust, Murrieta applied $1,725,000 to repay a loan from Valley Bank to Charles Rich, $1,525,000 to repay a loan from Valley Bank to Sidney Wyman, and $250,000 to repay a loan from Nevada State Bank to Morris Shenker carried on its books in the name of Sidney Wyman.

73. None of the $5 million lent by the Pension Trust to Murrieta was used to develop or sell the Yoder parcel.

74. As of December 1, 1975, and March 30, 1977, the Yoder parcel was completely undeveloped and unsold.

**C. The $8 Million Loan to Sierra**

75. On May 17 and June 3, 1974, Shenker, then the principal owner of Sierra, together with Stanley Franklin, its president, and Eric Swanson, its controller, made loan presentations to the Pension Trust trustees in which Shenker requested an $8 million loan for Sierra.

76. During the loan presentation Shenker stated that the bulk of the loan proceeds would be used to develop and sell the real estate which would constitute the collateral securing the loan, although he had previously informed Franklin and Swanson that he intended to use the loan proceeds for his other businesses as well.

77. On June 7, 1974, after the loan presentation by Shenker, the Pension Trust entered into an agreement to loan $8 million to Sierra.

78. In conjunction with the $8 million loan agreement, on June 11, 1974, Sierra executed a promissory note in favor of the Pension Trust in the principal sum of $8 million.

79. The promissory note provided in part that commencing July 11, 1974, Sierra would pay interest monthly at the rate of 1.5 percent above the prime rate but not less than 9 percent nor more than 11 percent. Commencing 5 years after the last disbursement of principal, Sierra was to pay 5 equal annual installments determined by the unpaid principal and interest balance, with all unpaid principal and interest due and payable 10 years after the last disbursement of principal under the loan.

80. The note further provided that should default be made in any installment of principal and interest, and such default remained 30 days after notice, the whole sum of principal and interest could become due and payable at the option of the Pension Trust.

81. Shenker executed the $8 million promissory note as guarantor of Sierra.

82. In conjunction with the $8 million loan agreement, on June 7, 1974, Sierra executed a deed of trust in favor of the Pension Trust covering 352 lots in unit 6 and 1,010 lots in unit 7 of Gardnerville Ranchos at Gardnerville, Nevada, as security for the $8 million loan.

83. The loan agreement provided that the $8 million loan was subject to the condition precedent of the Pension Trust receiving an appraisal of the collateral establishing the fair market value of the collateral to be approximately $14 million.

84. Sierra, prior to the execution of the $8 million loan agreement, submitted appraisals of the 701 lots in unit 6 and the 1,010 lots in unit 7 at Gardnerville. The appraisals represented the total estimated values of unit 6 to be $7,335,700 as of August 20, 1973 and of unit 7 to be $10,604,400 as of March 25, 1974. These appraisals assumed that all off-site improvements were completed and installed and that adequate water and sewer facilities would be available to all lots.

85. During the period from June 6, 1974, through May 20, 1975, the Pension Trust disbursed $7,450,000 to Sierra pursuant to the $8 million loan agreement.

86. During the period in which sums were disbursed by the Pension Trust to Sierra under the $8 million loan agreement, Sierra advanced at least $1,800,000 to Murrieta, $939,000 to I.J.K., and $800,000 to Sidney Wyman. During this same period 85 to 90 percent of funds of Sierra were provided by the Pension Trust.

87. As of December 1, 1975, and even by March 30, 1977, all off-site improve-

ments at units six and seven were not completed and installed, including adequate water and sewer facilities.

## D. The First Addendum Loan to Sierra and Interest Moratorium with Murrieta

88. As of December 31, 1974, approximately $92,000 in interest payments were in arrears on the $2 million and $5 million Murrieta loans. From that date to July 31, 1975, this unpaid amount increased to approximately $155,000.

89. As of December 31, 1974, interest payments on the Sierra $8 million loan were in arrears in the amount of $136,000. These interest payments remained in arrears through July 31, 1975, when interest payments on the Sierra $8 million loan were delinquent in the amount of approximately $99,000.

90. By notice dated July 7, 1975, and by order dated July 11, 1975, the Office of Interstate Land Sales Registration of the Department of Housing and Urban Development (HUD) suspended Sierra's filing and permit to sell lots at Gardnerville Ranchos units 4 and 6, the principal source of Sierra's lot sales at that time. HUD did not lift the suspension until approximately December 24, 1975.

91. As of about May 1975 Environmental Communities, Inc. (ECI), Sierra's contractor for units 6 and 7 at Gardnerville, went bankrupt without completing the improvements at units 6 and 7 or at ECI's other projects, including Big Bear 11 and 12, the Quechan Indian Tribe job and the Santa Fe Railroad. The cost of ECI's work remaining uncompleted as of its bankruptcy was in excess of $2 million. Argonaut Insurance Company (Argonaut) had issued performance bonds on behalf of ECI for these projects. Sierra and Shenker had agreed to indemnify Argonaut for any losses the latter incurred as a result of ECI's failure to complete these projects.

92. On June 24, July 1, July 10, and July 14, 1975, Shenker met with various representatives and trustees of the Pension Trust. Shenker informed the trustees that Murrieta could not make monthly interest payments on the $2 million and $5 million loans and required a two-year moratorium on these loans. Shenker further informed the trustees that Sierra required a letter of credit for a bond for power and telephone improvements at Gardnerville units six and seven in the sum of $1,800,000 and additional advances totaling $1,350,000.

93. In these meetings Shenker represented that it was Sierra's selling season and that Sierra's lot sales were going well, when actually HUD had suspended Sierra's lot sales by notice given on July 7, 1975, and by order given on July 11, 1975. Shenker further represented that Sierra was a viable company, that Sierra's real property could be developed and sold, and that the Pension Trust's loan to Sierra could thereby be repaid. Shenker represented that Sierra would receive the additional advances totaling $1,350,000 only as sales of lots were occurring, that Sierra would use those additional advances only for its lot sales business, and that Sierra would return $2,800,000 worth of lot paper to the Pension Trust.

94. On July 28, 1975, the Pension Trust trustees, relying on Shenker's representations and promises, entered into a new loan agreement with Sierra. This agreement is entitled "Addendum to and Modification of Loan Agreement" (First Addendum).

95. The First Addendum provided in part that the Pension Trust would loan Sierra $1,350,000 over and above the $8 million loan and that the Pension Trust would provide Sierra with letters of credit necessary to procure performance bonds for off-site and utility improvements on the lots at units six and seven at Gardnerville. The additional advances to Sierra were to be used by Sierra only for land, improvements, sales, and corporate expenses in accordance with Exhibit "A" to the First Addendum. If the Pension Trust determined that Sierra did not use the additional advances substantially in accordance with Exhibit "A" to the First Addendum, the Pension Trust could, at its sole option,

**1378**

withhold further advances until the default was cured.

96. The First Addendum obligated Sierra to pay interest monthly on the additional advances at the rate of 1.5 percent over prime rate per annum, but not less than 9 percent nor more than 11 percent per annum. Sierra could repay the additional advances by assigning lot paper, totaling the face amount of $3,690,000 during the period of August 1975 through December 1975, or by paying cash.

97. Sierra agreed to guarantee for two years from the first advance under the First Addendum the payment of interest owed by Murrieta to the Pension Trust on the Murrieta $2 million and $5 million loans.

98. The Pension Trust also entered into an agreement with Murrieta on July 28, 1975, whereby the Pension Trust agreed that Murrieta would have a two-year moratorium on interest payments on the Murrieta $2 million and $5 million loans, provided that Sierra performed its obligation under the First Addendum to pay this interest as guarantor on behalf of Murrieta.

99. During the period of August 4, 1975, through December 1, 1975, the Pension Trust disbursed $1,350,000 to Sierra under the First Addendum.

100. On July 24, July 29, and November 18, 1975, the Pension Trust executed letters of credit on behalf of Sierra pursuant to the First Addendum totaling $1,595,228 to Continental Telephone and Argonaut.

101. On or about August 4, 1975, the Pension Trust made its first advance to Sierra under the First Addendum in the amount of $225,000. Sierra disbursed approximately $163,000 of this advance for purposes other than those stated in Exhibit "A" to the First Addendum, including a loan of approximately $108,000 to John Pilkington for his personal purchase of Home Savings stock.

102. During the period of disbursements under the First Addendum, the lot paper assigned by Sierra to the Pension Trust only increased from $925,285 to $1,113,000—that is, only about $188,000. Sierra had projected and represented that it would assign lot paper worth $3,690,000.

103. During the months of June through November 1975, Sierra failed to pay monthly interest due the Pension Trust under the $8 million and First Addendum loans. As of December 1, 1975, this interest totaled $346,578. The Pension Trust notified Sierra and Shenker by letters dated September 30 and November 4, 1975 of Sierra's delinquency and requested prompt payment.

104. During the months of March through November 1975, Murrieta and Sierra (as Murrieta's guarantor under the First Addendum) failed to pay monthly interest due under the $2 million and $5 million loans. As of December 1, 1975, this interest totaled $363,125. The Pension Trust notified Sierra and Shenker by letters dated September 30 and November 4, 1975, of Sierra's delinquency and requested prompt payment.

105. As of April 30, 1975, Sierra had a cumulative loss of $4,073,231 and a net capital deficiency of $4,016,531.

106. As of June 30, 1974, Murrieta had a cumulative loss of $12,504,657 and a net capital deficiency of $13,919,907.

107. As of November 15, 1974, Murrieta's auditors had concluded that Murrieta's ability to continue as a going concern was dependent upon its ability to pay its liabilities as they became due, to obtain adequate financing, to sell its real estate at substantial profits, and to substantially improve the operating results of the Murrieta Spa, the outcome of which could not then be determined.

108. As of September 4, 1975, Sierra's auditors had concluded that Sierra's ability to continue as a going concern was dependent upon future developments including its ability to pay its liabilities as they became due, to obtain adequate financing and an effective HUD registration, and to sell its real estate at substantial profits, the outcome of which could not then be determined.

## E. The Second Addendum

### 1. Negotiations

109. During the months of October and November 1975, Ken Unruh and Shenker, on behalf of Shenker, Sierra, and Murrieta, and I.R. Ashleman, on behalf of the Pension Trust, negotiated a proposed new loan agreement between the Pension Trust, Sierra, and Murrieta to be guaranteed by Shenker (the sole owner of Murrieta and the owner with his son and daughter of Sierra).

110. During the negotiations Andrew Stevens, Sierra's vice president and sales manager, and Stanley Franklin, Sierra's president, prepared and presented to the Pension Trust's representatives projections of future lot sales by Sierra at Gardnerville units six, seven, eight, and nine. Sierra's projections forecasted that during the three year term for the new loan agreement Sierra and Murrieta would sell 4,670 lots and generate additional lot paper with a face amount of $29,699,000.

111. Stevens and Franklin represented to Pension Trust representatives that Sierra's sales projections were reasonable and attainable.

112. In at least two material respects, the sales projections of Sierra were false and misleading. First, Sierra and Murrieta misrepresented the number of lots they had available to sell: instead of 4,670 lots, they had only 3,622 lots. The actual lots available for sale were comprised of the following: Murrieta had 211 lots. Gardnerville unit six had 701 lots, approximately 600 of which were already sold in the fall of 1975. Unit seven had 1,010 lots. Sierra estimated that units eight and nine would yield 1,700 lots, but at the time of the sales projections, these units were undeveloped and their subdivision plans were unapproved by Douglas County. Sierra's projections for the remaining 1,059 lots depended upon trading Genoa Peak to the Bureau of Land Management (BLM) for developable land adjacent to units eight and nine. No agreement existed with the BLM to make this exchange. Second, the sales rate projected by Sierra was substantially higher than Sierra had ever achieved.

113. Prior to December 1, 1975, I.R. Ashleman gave Ken Unruh, Shenker's consultant, copies of the Pension Trust's financial statements which revealed that the then outstanding loans to Murrieta and Sierra comprised more than 50 percent of the Pension Trust's assets.

114. Prior to December 1, 1975, Shenker participated in or was knowledgeable about the bargaining sessions between the Nevada Resort Association and Culinary Workers Local 226 and Bartenders Local 165 during which the employer's contribution rates to the Pension Trust were discussed.

115. As of December 1, 1975, the Pension Trust because of Murrieta's and Sierra's delinquencies in making interest payments, was legally entitled to declare all principal and interest due on the $2 million, $5 million, $8 million, and the First Addendum loans, to foreclose on the collateral securing these loans, to sue Murrieta and Sierra for any deficiencies, and to sue Shenker as guarantor for Sierra's deficiency.

116. As of December 1, 1975, Sierra could not have continued its lot sales business at Gardnerville without substantial new financing.

117. As of December 1, 1975, the Pension Trust had no preexisting legal obligation to loan any more money to either Sierra or Murrieta.

118. As of July 28 and December 1, 1975, the Pension Trust trustees knew that Shenker was a part-owner of the Dunes, the Dunes was a contributing employer to the Pension Trust, and Shenker would benefit from the First and Second Addenda.

119. As of July 28 and December 1, 1975, the Pension Trust trustees had not obtained:

(a) independent appraisals of any of the collateral securing the $2 million, $5 million, $8 million, First Addendum, or Second Addendum loans;

(b) an independent feasibility study by a qualified expert to determine whether Sierra's and Murrieta's net income from the lot sales programs contemplated by the Second Addendum would be sufficient to repay all principal and interest on the loans thereunder; and

(c) an independently audited financial statement of the guarantor of the $8 million and Second Addendum loans.

### 2. Terms

120. On December 1, 1975, the Pension Trust's trustees entered into a new loan agreement with Sierra, Murrieta, and Shenker (as guarantor) entitled "Second Addendum to and Modification of Loan Agreement of June 7, 1974 and First Addendum to and Modification of July 28, 1975" (Second Addendum). Exhibit "A" to the Second Addendum, which sets forth Sierra's estimated cash requirements and sales projections, is an integral part of the Second Addendum.

121. The Second Addendum provided in part that rather than declare all principal and interest due and owing on the delinquent $2 million and $5 million loans to Murrieta and the $8 million and First Addendum loans to Sierra, which totaled $16,-507,682.96 on December 1, 1975, the prior loans were renewed and the delinquent interest was reclassified as principal.

122. The Second Addendum further provided that the Pension Trust agreed to lend Sierra monies in monthly advances up to an additional $16,571,000 over three years, in addition to the $16,507,682.96 which Murrieta and Sierra then owed to the Pension Trust, so long as Sierra's sales projections set forth in Exhibit "A" to the Second Addendum were attained and Sierra complied with its other obligations under the Second Addendum, Exhibit "A," and the prior loan agreements.

123. Of the $16,571,000 in additional lending projected by Exhibit "A" to the Second Addendum, approximately $8,400,-000 was to be paid for Sierra's sales and commission expenses, $3,100,000 for improvements to Sierra's real property, $1,800,000 for Sierra's general and administrative costs, $2,800,000 for its existing indebtedness and $500,000 for taxes and assessments on its real property.

124. Sierra agreed in the Second Addendum that to the extent determined feasible by the parties it would develop a sales marketing and development program for 211 lots of Murrieta which constituted the collateral for the $2 million loan.

125. Under the Second Addendum the Pension Trust agreed to make additional loan advances up to $1,358,000 to Sierra for the purpose of financing the marketing and development program for the 211 lots securing the $2 million loan.

126. The sales projections of Sierra set forth in Exhibit "A" to the Second Addendum projected that during the three year term of the Second Addendum Sierra and Murrieta would sell a total of 4,670 net lots for $32,966,000 of which $29,699,000 would be net third party lot sales contracts (lot paper) assigned to the Pension Trust. Sierra was projected to assign net lot paper to the Pension Trust having the face amount of $7,853,000 during year one, $9,188,000 during year two, and $9,188,000 during year three. Murrieta was projected to assign net lot paper having the face amount of $3,470,000 to the Pension Trust in year one. With $1,113,000 worth of previously assigned lot paper, Exhibit "A" to the Second Addendum projected that the Pension Trust would receive a total face amount of $30,812,000 in net lot paper by the end of the three year term of the Second Addendum.

127. The parties to the Second Addendum contemplated that the sale of lots and the assignment of lot paper by Sierra and Murrieta to the Pension Trust would be the principal method of repaying the Pension Trust's loans.

128. The Second Addendum provided and the parties thereto understood that the Pension Trust could discontinue loaning monies to Sierra any time during the three year term that Sierra failed to attain the sales projections stated in Exhibit "A."

129. The Second Addendum provided that all sums, whether principal, interest, or other fees due and owing by Sierra as of December 1, 1975, were to be computed as principal and to draw interest at the rate of 11 percent per annum.

130. The Second Addendum provided that interest on the recomputed amount due by Sierra as of December 1, 1975, and on future advances under the Second Addendum would be due monthly at the rate of 11 percent per annum, but any such interest that thereafter became due and was unpaid would bear interest as principal at the rate of 11 percent per annum thereafter.

131. The Second Addendum provided that the sums previously due the Pension Trust by Murrieta would bear interest at the rate of 10 percent per annum which interest would remain due and payable monthly.

132. The Second Addendum provided that Sierra would furnish a complete financial statement prepared in accordance with generally accepted accounting principles with a report of an independent CPA thereon within 120 days of the end of each fiscal year.

133. The Second Addendum provided that Sierra would furnish a quarterly financial report within 60 days after the end of each quarter.

134. Sierra agreed that the Second Addendum constituted a pledge of all its equity in all assets then held or thereafter acquired as further security for the Pension Trust's loans.

135. Sierra agreed under the Second Addendum to guarantee repayment of all principal and interest owed by Murrieta under the $2 million and $5 million loans.

136. Shenker agreed under the Second Addendum to guarantee repayment of all funds previously advanced to Sierra, all additional funds to be advanced to Sierra for any purpose under the terms of the Second Addendum, and interest thereon at 11 percent per annum.

137. The Second Addendum provided that Sierra was to repay the sums lent to it in accordance with the repayment provisions of the $8 million loan agreement and the First and Second Addenda loan agreements, which provided for the payment of interest monthly with principal due in five equal consecutive annual installments commencing five years after the last principal advance under the $8 million loan.

138. From July 28, 1975, through March 30, 1977, the parties, as a matter of practice under both the First and Second Addenda agreed to treat all lot paper assigned by Sierra to the Pension Trust as collateral rather than partial repayment of the loans.

139. Exhibit "A" to the Second Addendum projected that a face amount of $30,812,000 in net lot paper would be assigned by Sierra and Murrieta to the Pension Trust by the end of the three year term. This amount was approximately $2,200,000 less than the principal sum of the amount owed by Murrieta and Sierra as of December 1, 1975, $16,507,682.96, plus the additional sums to be lent under the Second Addendum, $16,571,000, which totaled $33,078,682.96. The projected lot paper, which was the principal means of repaying the loans under the Second Addendum, therefore would not be sufficient to fully repay the principal lent under the Second Addendum and the prior loans renewed thereby to Murrieta and Sierra. The projected lot paper would not repay any of the interest which would accrue on those loans during the 3 year term of the Second Addendum and the 15 subsequent years in which cash payments would be made on the lot paper assigned by Sierra and Murrieta.

140. Assuming that the Second Addendum was fully and timely performed by the Pension Trust and Sierra, with every lot being sold as scheduled by Exhibit "A" with no defaults nor delinquent payments on lot sales contracts, the balance owing to the Pension Trust of $16,528,886 as of December 1, 1975,[2] would have increased to

2. The court adopts the plaintiff's balance owing to the Pension Trust as of December 1, 1975.

$30,949,416 as of September 1, 1993, the month of the last collection of lot paper. The representatives of Sierra, Murrieta, and Shenker did not notify any representative or trustee of the Pension Trust of this result prior to the execution of the Second Addendum on December 1, 1975.

141. Assuming that Sierra continued to sell the lots projected by Exhibit "A" in accordance with its prior sales history, and further assuming that the Pension Trust funded Sierra during the nine year period which would have been necessary in the total amount of $21,800,000, the balance owing to the Pension Trust would have increased to $121,934,097 as of March 1, 1999, the month of the last collection of lot paper. The representatives of Sierra, Murrieta, and Shenker did not notify any representative or trustee of the Pension Trust of this result prior to the execution of the Second Addendum on December 1, 1975.

## III. DISBURSEMENT AND APPLICATION OF ASSETS UNDER THE SECOND ADDENDUM

142. During the period from December 1, 1975, through March 30, 1977, the period of the Second Addendum, the Pension Trust made advances to Sierra totaling $9,130,000.

### A. Uses by Murrieta

143. Of the $9,130,000 advanced by the Pension Trust pursuant to the Second Addendum, approximately $1,300,000 was disbursed by Sierra to or on behalf of Murrieta, which was solely owned by Shenker.

144. Sierra used most of the $1,300,000 disbursed to or on behalf of Murrieta to conduct a sales program to sell the 209 lots securing the $2 million loan to residents of Mexico. The sales commission which Murrieta paid up front to the brokers substantially exceeded the down payment received from the purported purchasers, thereby causing a significant out-of-pocket cash drain from the Pension Trust through Sierra to the brokers. Although sales contracts were executed for all 209 Murrieta lots

See Plaintiff's Exhibit No. 2611.

during 1976, every alleged purchaser except one had defaulted as of March 30, 1977, thereby rendering the lot paper worthless. Murrieta therefore failed to meet the Exhibit "A" projection that it would assign a face amount of $3,470,000 in net lot paper during the first year of the Second Addendum.

### B. Uses by S & F

145. Of the $9,130,000 advanced by the Pension Trust to Sierra under the Second Addendum, approximately $1,300,000 was disbursed by Sierra to S & F and its subsidiary, Palm, from March 1976 to March 1977.

146. On March 27, 1975, S & F, a shell company with no substantial assets and owned solely by Shenker and his family, purchased various assets of the financially ailing real estate development company known as Falls Land and Development Corporation (FLDC). The assets acquired by S & F included properties at Elephant Butte, Lakeshore Highlands, and Meadow Lakes, all in New Mexico, and third party lot sales contracts with a face amount of approximately $5,200,000. S & F assumed obligations in excess of $1 million including the construction of certain improvements on the property acquired. In connection with the purchase Shenker guaranteed a promissory note of S & F in the sum of $300,000 in favor of The First National Bank of Albuquerque.

147. On March 27, 1975, Palm, a shell company with no substantial assets and wholly owned by S & F, purchased approximately 960 acres at Volcano Cliffs near Albuquerque for $1,100,000 payable in 20 quarterly installments of $55,000 plus interest. FLDC had lost Volcano Cliffs by foreclosure in November 1974. Palm executed a promissory note for the $1,100,000 purchase in favor of The First National Bank of Albuquerque, which was secured by a first mortgage on Volcano Cliffs and by Shenker's personal guarantee.

148. In early 1975, in the course of the purchase of the assets of FLDC by S & F and Palm, Shenker had promised D.W. Falls, FLDC's owner, that Shenker would provide sufficient funds for S & F and Palm to develop the properties being acquired and thereby repay S & F's $1.5 million note in favor of Falls.

149. On March 27, 1975, S & F assigned $4 million worth of lot sales contracts it had purchased from FLDC to Mission Hills, another company controlled by Shenker, for $2 million cash. In March, April, and May 1975, Shenker caused approximately $1.25 million of this cash to be disbursed to Murrieta, Sierra, and himself. This cash disbursal jeopardized the business existence of S & F and Palm.

150. By late 1975 and early 1976, S & F and Palm, without further financing, would have had to cease their business operations.

151. S & F and Palm used the $1,300,000 in Pension Trust assets advanced by Sierra to make payments on the loans Shenker had guaranteed and to operate their respective businesses.

152. As of March 30, 1977, Shenker had failed to personally make any payments to the First National Bank of Albuquerque on the S & F or Palm loans. The principal amounts of these loans were $300,000 and $1,100,000.

## C. Uses by Seaview

153. Of the $9,130,000 advanced by the Pension Trust to Sierra under the Second Addendum, approximately $421,000 was disbursed by Sierra to or on behalf of its subsidiary, Seaview Village, Inc. (Seaview).

154. By September 1976, Sierra acquired 100 percent of the stock of Seaview for $3,000 plus the assumption of approximately $800,000 in promissory notes owed by Seaview. The principal assets of Seaview were a 530-acre parcel near Lincoln City, Oregon, known as Timbershore and a water company with approximately 300 customers.

155. The approximately $421,000 in Pension Trust assets disbursed by Sierra to Seaview was generally used by Seaview to make note payments and for administrative and construction costs.

## D. Uses by Sierra

156. Of the $9,130,000 advanced by the Pension Trust to Sierra under the Second Addendum, the remaining approximately $6 million was applied by Sierra in connection with its own corporate business.

## IV. SIERRA'S MATERIAL FAILURES TO PERFORM THE SECOND ADDENDUM

157. During the Second Addendum period Sierra failed to fully pay any of the 16 monthly interest payments due the Pension Trust. As of March 30, 1977, Sierra owed at least $2,058,155 in cumulative interest to the Pension Trust.

158. During the Second Addendum period, Sierra substantially failed to meet the lot sales projections in Exhibit "A" during the 16 months of the Second Addendum.

159. Only one revision of the sales projections set forth in Exhibit "A" was prepared by Sierra. This revision projected the sales from units six and seven at Gardnerville for the period of July 1, 1976 through June 30, 1977.

160. Sierra substantially failed to meet the sales projections set forth in the single revision to Exhibit "A" during every month from July 1976 through March 1977.

161. As of March 30, 1977, Exhibit "A" projected that Sierra and Murrieta would have assigned to the Pension Trust lot paper having a total face amount of $17,027,000. Sierra had actually assigned, a total face amount of only $1,419,497 in lot paper to the Pension Trust as of that date.

162. As of March 30, 1977, Sierra had failed to complete the off-site improvements on units six and seven at Gardnerville as projected in Exhibit "A" to the Second Addendum. On March 24, 1977, Ken Unruh, the president of Sierra, informed the trustees of the Pension Trust that the estimated cost to complete the

remaining improvements at Gardnerville units six and seven was $5,640,951.

163. Exhibit "A" to the Second Addendum had scheduled the construction of the sewer intercepter line, which was a precondition to the issuance of building permits on units six and seven at Gardnerville, for early 1977. On March 24, 1977, Unruh informed the trustees of the Pension Trust that the sewer intercepter line would be completed no earlier than February of 1978 and possibly as late as the fall of 1978. Unruh added that if the line was not completed until the fall of 1978 HUD would define the delay as a material change and allow all prior purchasers of Sierra's lots to rescind their purchases.

164. Sierra failed to timely provide the Pension Trust with either annual or quarterly financial statements as required by the Second Addendum, primarily because its books and records were disorganized and incomplete.

165. When a financial statement for Sierra was finally completed after March 30, 1977, at the expense of the Pension Trust, the statement revealed that from its inception through October 31, 1976, Sierra had sustained cumulative losses of $9,443,000 from operations and had a capital deficiency of $9,386,000. The auditor of Sierra, Laventhol & Horwath, which also was the auditor for the Dunes, concluded that the continued existence of Sierra was doubtful.

166. Murrieta, from its inception through March 31, 1976, had sustained a cumulative loss of $19,666,134 and had a capital deficiency of $21,194,273.

## V. THE PENSION TRUST DID NOT ENGAGE IN ANY CONDUCT WHICH WOULD CONSTITUTE A WAIVER OF ANY OF ITS RIGHTS UNDER THE SECOND ADDENDUM

167. The parties to the Second Addendum agreed that there would be no oral modifications of the agreement.

168. There was never any written modification to the Second Addendum signed by Pension Trust trustees.

169. The Pension Trust trustees did not commit any act, engage in any conduct, or make any statement constituting a waiver of any of the rights of the Pension Trust under the Second Addendum.

170. The Pension Trust trustees did not commit any act, engage in any conduct or make any statement obligating the Pension Trust to extend any credit or make any loan to S & F, Palm, or Seaview.

171. The Pension Trust trustees did not commit any act, engage in any conduct or make any statement obligating the Pension Trust to extend any credit or make any loan to Sierra or Murrieta in excess of the conditional commitments stated in the Second Addendum and Exhibit "A" thereto.

## VI. NONDIVERSIFICATION OF PENSION TRUST ASSETS

172. As of December 31, 1974, the principal on the outstanding loans of the Pension Trust to Murrieta and Sierra constituted $12,950,000 of its total assets of $19,764,437, a total of approximately 67 percent.

173. As of December 31, 1975, the outstanding loans of the Pension Trust to Murrieta and Sierra constituted $16,692,514 of its total assets of $29,092,036, or 57 percent.

174. As of December 31, 1976, the outstanding loans of the Pension Trust to Murrieta and Sierra constituted $23,685,000 of its total assets of $41,567,000, or 59 percent.

175. In early 1977 the actuary of the Pension Trust advised the trustees of the Pension Trust that if the loans to Murrieta and Sierra outstanding as of December 31, 1976, were lost the Pension Trust would be actuarially under-funded by approximately $8 million.

176. As of December 31, 1977, the outstanding loans of the Pension Trust to Murrieta and Sierra constituted 53 percent of its total assets.

## VII. BENEFITS TO SHENKER UNDER THE FIRST AND SECOND ADDENDA

177. Shenker, together with his son and daughter, owned 100 percent of the voting

stock of Sierra during the periods of time when Sierra received from the Pension Trust (1) letters of credit worth $1,595,228 and cash advances of $1,350,000 under the First Addendum and (2) cash advances totaling $9,130,000 and the renewal of the delinquent $8 million loan and the First Addendum loan under the Second Addendum.

178. Shenker owned 100 percent of the voting stock of Murrieta at all times when, pursuant to the Second Addendum, the latter received approximately $1,300,000 and the renewal of the delinquent $2 million and $5 million loans to Murrieta.

179. Shenker personally guaranteed the repayment of $7,450,000 advanced to Sierra pursuant to the $8 million loan. By December 1, 1975, Sierra was delinquent in the payment of at least 5 months' interest totaling in excess of $598,000 on the $8 million loan and the First Addendum. Sierra could not have continued its lot sales business without further Pension Trust financing. The $8 million loan agreement and note entitled the Pension Trust to declare a default for delinquency in interest, accelerate all interest and principal due, and sue Sierra and Shenker, its guarantor, for those sums. The choice for the Pension Trust was either to exercise its legal right to sue Sierra and Shenker on his guarantee or to enter into a work-out loan such as the Second Addendum. The Second Addendum enabled Shenker to avoid being called on his guarantee of the prior loan from the Pension Trust to Sierra in December 1, 1975, and provided additional funds for the development and sale of the property of Sierra in order to repay those loans.

180. On or about December 7, 1973, Shenker agreed to personally indemnify Argonaut for any losses on its performance bonds in favor of ECI for a number of the construction projects of ECI including units six and seven at Gardnerville, the Santa Fe Railroad, Big Bear 11 and 12, and the Quechan Indian Tribe project. ECI went bankrupt without finishing these jobs in mid-1975. The Pension Trust, under the Second Addendum, advanced at least $400,000 to complete the Santa Fe, Big Bear, and Quechan projects and at least $2 million to complete the work of ECI at units 6 and 7, thereby enabling Shenker to avoid at least $2,400,000 in liability under his indemnity of Argonaut.

181. On or about April 1 and August 20, 1973, Shenker personally guaranteed the annual installments due on the Grid bonds on Gardnerville units six and seven which totaled $130,000 in 1975, $380,000, in 1976 and $680,000 in 1977. Under the Second Addendum, Pension Trust assets were used by Sierra to pay these installments, thereby enabling Shenker to avoid in excess of $1 million in liability under his guarantee of the Grid bonds.

182. On or about February 14 and March 10, 1975, Shenker personally guaranteed the repayment of in excess of $1,000,000 of the $2,450,000 in loans ultimately extended to Sierra or its subsidiaries by Valley Bank. Pension Trust monies in excess of $900,000 were advanced under the Second Addendum in partial repayment of those loans, and subsequently the Pension Trust settled its liability under its guarantee of the Valley Bank loan consolidation for an additional payment of $1,951,445.39. These Pension Trust payments enabled Shenker to avoid liability in excess of $1 million on his guarantees to Valley Bank.

183. On or about April 24, 1973, Shenker personally guaranteed the repayment of the loan from General Electric (GE) to Sierra of approximately $2,500,000. This loan was ultimately repaid in full in or about 1983 through the sale of Sierra lots and the assignment of lot paper to GE. In the fall of 1975, the lot sales of Sierra had been suspended by HUD, the GE loan had not been repaid in full, and the lot paper then assigned by Sierra to GE could have been rescinded by the purchasers if the HUD suspension was not lifted. The financing supplied under the Second Addendum enabled Sierra to requalify its sales with HUD, to sell and assign sufficient lot paper to repay the GE loan, and thereby enabled

Shenker to avoid liability of up to $2,500,-000 on his guarantee to GE.

184. Shenker ordered or allowed the disbursement of more than $3.5 million in Pension Fund assets received by Sierra under the $8 million loan and the First Addendum for his personal uses, including the following: (a) approximately $939,000 for the purchase of 61,000 shares of Dunes stock and payment of interest on prior purchases through Shenker's wholly-owned corporation I.J.K. from November 1974 through May 1975; (b) $1,800,000 to Shenker's wholly-owned corporation Murrieta from June 1974 through May 1975; and (c) cash advanced to himself, $340,000, and to associates such as Sidney Wyman, $800,-000, and John Pilkington, $108,000.

In the fall of 1975, the lot sales program of Sierra was suspended by HUD. Sierra required millions of dollars in financing to resume its lot sales program. In order to enable Sierra to resume, Shenker had to obtain further financing for Sierra by (1) restoring at least the $3.5 million he had diverted for his personal uses or (2) by obtaining significant new financing or (3) by some combination of these alternatives. The Second Addendum, by providing further financing for Sierra, enabled Shenker to avoid either insolvency of Sierra or the immediate repayment of the monies diverted for his personal uses.

185. Shenker together with his wife, son, and daughter owned S & F and its wholly-owned subsidiary Palm at all times from March 27, 1975 to the present. During the period from March 1976 through March 30, 1977, S & F and Palm received approximately $1,300,000 in Pension Trust assets advanced to Sierra under the Second Addendum.

(a) In early 1975, Shenker, in the course of purchasing the assets of FLDC by S & F and Palm, promised D.W. Falls, then owner of FLDC, that he (Shenker) would provide sufficient funds for S & F and Palm to develop the properties being acquired so that those companies could repay Fall's $1.5 million note from S & F. Shenker then utilized $1.25 million of cash from S &

F for Sierra, Murrieta, and his personal uses, which uses jeopardized the business existence of S & F by the end of 1975. The disbursement of $1,300,000 in Pension Trust assets advanced to S & F and Palm enabled Shenker to avoid (1) the immediate repayment of the monies he and his other companies had received from S & F, (2) the financing of S & F and Palm by himself, or (3) the closure of his New Mexico operations.

(b) As of March 1976, S & F and Palm had received loans of $300,000 and $1,100,-000 from the First National Bank of Albuquerque. Shenker had guaranteed the repayment of both loans, the latter of which was delinquent. Hundreds of thousands of dollars of Pension Trust assets advanced to Sierra under the Second Addendum were used to make the payments due on these loans, thereby enabling Shenker to avoid liability on his guarantees.

## VIII. TERMINATION OF FUNDING UNDER THE SECOND ADDENDUM

186. On March 25, 1977, the Pension Trust trustees rejected the new budget request by Sierra for $12,963,043 for the period ending April 30, 1978.

187. On March 30, 1977, the Department of Labor filed this action against certain Pension Trust trustees, Shenker, and some of Shenker's companies, naming the Pension Trust as an involuntary plaintiff.

188. The Pension Trust did not lend any more money to Sierra, Murrieta, or Shenker after March 30, 1977. As of that date, the Pension Trust had lent a total principal of $17,930,000 to Sierra and $7,000,000 to Murrieta, a total of $24,930,000.

189. In May 1977, the Pension Trust trustees and the Department of Labor stipulated that the Pension Trust would not lend any more money to Sierra or Murrieta and that a qualified investment manager for the Pension Trust would be appointed to manage the loans of the Pension Trust to Sierra and Murrieta and the real estate assets related to those loans. The stipulation was approved by this court on August 30, 1977.

190. Sierra, Murrieta, and Shenker were aware of the proposed stipulation terminating funding but they failed to express any objection to it before this court.

191. Neither Sierra, Murrieta, nor Shenker ever moved this court for an order compelling the Pension Trust to continue funding Sierra under the Second Addendum.

192. After the termination of funding to Sierra from the Pension Trust under the Second Addendum, Sierra voluntarily, without suggestion from or influence by the Pension Trust, suspended its lot sales business at Gardnerville in about April 1977.

193. Neither Shenker nor Sierra made any attempts to obtain financing for the lot sales business of Sierra after funding was discontinued on March 30, 1977.

194. Shenker did not personally provide any financing for Sierra's lot sales business after funding stopped on March 30, 1977.

195. There is no evidence that Sierra or Shenker suffered any lost profits or other damages as a result of the termination by the Pension Trust of funding under the Second Addendum on March 30, 1977.

## IX. CREDITS DUE DEFENDANTS SHENKER OR SIERRA UNDER THE MURRIETA AND SIERRA LOANS

196. Shenker is entitled to receive net credit in the following amount against the $2 million Murrieta loan balance for the fair market value of the real properties voluntarily or involuntarily transferred to the Pension Trust on the date indicated:
Assets: 163 Murrieta mobile home lots, 46 R-3 lots and Karlins contracts.
Credit date: 2/20/81
Gross value: $2,000,000.
Expenses and liens: $513,650.55
Net credit: $1,486,349.45

197. Shenker is entitled to receive net credit in the following amount against the $5 million Murrieta loan balance for the fair market value of the real properties voluntarily or involuntarily transferred to the Pension Trust on the date indicated:
Asset: Yoder parcel (560 acres).
Credit date: 5/5/82
Gross value: $5,086,980
Expenses and liens: -0-
Net credit: $5,086,980.

198. The net credits on the two Murrieta loans total $6,573,329.45.

199. On August 26, 1976, the Valley Bank of Nevada (Valley Bank), Murrieta, and the Pension Trust entered into a loan agreement whereby the Pension Trust purportedly guaranteed repayment of warehouse lines of credit extended to Murrieta by Valley Bank (herein referred to as the Valley Bank-Murrieta-Trust loan agreement). The Pension Trust was also purportedly obligated by this agreement to exchange its own non-delinquent lot paper held as collateral for the Murrieta loans in return for delinquent lot paper held by Valley Bank.

200. In April of 1979 the Pension Trust, through its investment manager Karsten, received a demand letter from Valley Bank claiming that the Pension Trust must immediately pay $2.2 million to Valley Bank and turn over certain collateral that was held by the Pension Trust pursuant to the August 26, 1976 loan agreement. The Pension Trust disputed the claim of Valley Bank and filed an adversary complaint in the Murrieta Bankruptcy proceeding on June 8, 1979.

201. On November 26, 1979, the Pension Trust, through its investment manager Karsten, and Valley Bank entered into a settlement agreement whereby the Pension Trust was relieved of its purported guarantee of the loans of Murrieta and the purported obligation of the Pension Trust to exchange its own non-delinquent lot paper in return for Valley Bank's delinquent lot paper. Valley Bank received in exchange real property known as Genoa Peak. On the same date Shenker, Sierra, and the Pension Trust agreed that Shenker and Sierra would waive any rights they might have with respect to Genoa Peak, and the Pension Trust agreed to apply a credit of $150,000 to the unpaid principal amount of the Sierra loans.

202.  Sierra and Shenker are entitled to receive net credits in the following amounts against the Sierra loans for the fair market values of the real properties voluntarily or involuntarily transferred to the Pension Trust on the respective dates indicated:

(a)  **Asset:** Gardnerville Unit Six
  **Credit date:** 7/6/78
  **Gross value/gross receipt:** $540,000
  **Expenses and liens:** $332,643.95
  **Net credit:** $207,356.05

(b)  **Asset:** Gardnerville Unit Seven
  **Credit date:** 7/6/78
  **Gross value/gross receipt:** $800,000
  **Expenses and liens:** $3,749,162.83
  **Net credit:** –0–

(c)  **Asset:** Gardnerville Units Eight and Nine
  **Credit date:** 7/6/78
  **Gross value/gross receipt:** $1,035,000
  **Expenses and liens:** $5,057.51
  **Net credit:** $1,029,942.49

(d)  **Asset:** Gardnerville Lot Paper
  **Credit date:** 7/22/83
  **Gross value/gross receipt:** $2,022,815.07
  **Expenses and liens:** $403,549.33
  **Net credit:** $1,619,265.74

(e)  **Asset:** Genoa Peak
  **Credit date:** 11/26/79
  **Gross value/gross receipt:** $150,000
  **Expenses and liens:** –0–
  **Net credit:** $150,000

(f)  **Asset:** Timbershore (including three Sal-La-Sea lots)
  **Credit date:** 3/18/78
  **Gross value/gross receipt:** $889,450
  **Expenses and liens:** $845,776.90
  **Net credit:** $43,673.10

(g)  **Asset:** Salmon River Parcel
  **Credit date:** 3/17/78
  **Gross value/gross receipt:** $26,900
  **Expenses and liens:** –0–
  **Net credit:** $26,900

(h)  **Asset:** Oregon Lot Paper
  **Credit date:** 3/17/78
  **Gross value/gross receipt:** $33,857.54
  **Expenses and liens:** –0–
  **Net credit:** $33,857.54

(i)  **Asset:** Prosser Heights
  **Credit date:** 3/1/76
  **Gross value/gross receipt:** $108,140
  **Expenses and liens:** $10,000
  **Net credit:** $98,140

(j)  **Asset:** Murrieta Core
  **Credit date:** 2/20/81
  **Gross value/gross receipt:** $3,454,441
  **Expenses and liens:** $1,281,335.97
  **Net credit:** $2,173,105.03

(k)  **Asset:** Kanland (320 acre) Parcel
  **Credit date:** 2/20/81
  **Gross value/gross receipt:** $1,100,000
  **Expenses and liens:** $174,099.08
  **Net credit:** $925,900.92

(*l*)  **Asset:** 13 Murrieta Mobile Home Lots Securing Murrieta $120,000 Note to Sierra
  **Credit date:** 2/20/81
  **Gross value/gross receipt:** $65,000
  **Expenses and liens:** $28,468.45
  **Net credit:** $36,531.55

(m)  **Asset:** Swift 40 acres
  **Credit date:** 2/10/78
  **Gross value/gross receipt:** $43,599.52
  **Expenses and liens:** –0–
  **Net credit:** $43,599.52

(n)  **Asset:** Country Club Estates Mobile Home Park
  **Credit date:** 2/10/78
  **Gross value/gross receipt:** $14,969.73
  **Expenses and liens:** –0–
  **Net credit:** $14,969.73

(*o*)  **Asset:** Carson Valley Country Club Stock
  **Credit date:** 2/1/80
  **Gross value/gross receipt:** $175,000
  **Expenses and liens:** $4,726.46
  **Net credit:** $170,273.54

(p)  **Asset:** Home Savings Association Stock
  **Credit date:** 2/15/78
  **Gross value/gross receipt:** $10,156.25
  **Expenses and liens:** –0–
  **Net credit:** $10,156.25

(q)  **Asset:** Home Savings Association Stock
  **Credit date:** 3/8/79
  **Gross value/gross receipt:** $637,812.50
  **Expenses and liens:** $156,132.88

**Net credit:** $481,679.62

(r) **Asset:** Capital Energy Corp. Stock
  **Credit date:** 9/14/79
  **Gross value/gross receipt:** $50,153.13
  **Expenses and liens:** –0–
  **Net credit:** $50,153.13

(s) **Asset:** Volcano Cliffs/Meadow Lake Mortgages
  **Credit date:** 4/3/79
  **Gross value/gross receipt:** $966,256.27
  **Expenses and liens:** $59,493.45
  **Net credit:** $906,762.82

(t) **Asset:** Elephant Butte Mortgage
  **Credit date:** 4/7/80
  **Gross value/gross receipt:** $375,000
  **Expenses and liens:** –0–
  **Net credit:** $375,000

(u) **Asset:** Elephant Butte Mortgage
  **Credit date:** 7/6/83
  **Gross value/gross receipt:** $612,272.45
  **Expenses and liens:** $131,136.31
  **Net credit:** $481,136.14

(v) **Asset:** Claim against Sidney Wyman
  **Credit date:** 4/1/83
  **Gross value/gross receipt:** $200,000
  **Expenses and liens:** $18,295.89
  **Net credit:** $181,704.11

203. The net credits on the Sierra loans total $9,060,107.

## X. TOTAL MONIES OWED TO THE PENSION TRUST UNDER THE MURRIETA AND SIERRA LOANS

204. The balance due to the Pension Trust on the Murrieta $2,000,000 loan as of August 2, 1983, is $1,881,600, which amount accounts for the following:

  **Advances:** $2,000,000
  **Plus Accrued Interest:** $1,886,838
  **Less Payments—Borrower:** $336,521
  **Less Payments—Lot Paper:** $174,621
  **Less Collateral Credits:** $1,494,096

205. The balance due to the Pension Trust on the Murrieta $5,000,000 loan as of August 1, 1983, is $3,830,396 which amount accounts for the following:

  **Advances:** $5,000,000
  **Plus Accrued Interest and Expenses:** $4,609,289

  **Less Payments—Borrower:** $691,913
  **Less Payments—Lot Paper:** –0–
  **Less Collateral Credits:** $5,086,980

206. The balance due to the Pension Trust on the Sierra loan as of August 2, 1983, is $26,275,919 which amount accounts for the following:

  **Advances:** $17,930,000
  **Plus Accrued Interest:** $19,408,969
  **Less Payments—Borrower:** $444,117
  **Less Payments—Lot Paper:** $1,558,826
  **Less Collateral Credits:** $9,060,107

207. On May 25, 1976, Valley Bank consolidated certain loans owed to it by Sierra. This consolidation, referred to as the Valley Bank-Sierra-Trust loan agreement, was in the sum of $2,450,000. On May 25, 1976, the Pension Trust guaranteed the payment of this sum on behalf of Sierra. After March 30, 1977, the Pension Trust settled its liability under this guarantee with Valley Bank by payment of the sum of $1,951,445 to Valley Bank.

208. The Pension Trust is entitled to recover from Sierra $1,951,445 for monies paid by the Pension Trust to Valley Bank on the guarantee of the $2,450,000 Sierra loan from Valley Bank.

209. As of August 1, 1983, the total loan balance due to the Pension Trust, which amount includes the amounts due under the Murrieta $2,000,000 loan, Murrieta $5,000,000 loan, the Sierra loans, and payment made by the Pension Trust under the Valley Bank $2,450,000 loan guarantee, is $33,939,360.

## XI. DEFENDANT BEN SCHMOUTEY

210. The Secretary's complaint, as amended, alleges that the defendant Schmoutey, as trustee of the Pension Trust during the period January 1, 1975, to March 30, 1977, committed fiduciary breaches in violation of ERISA, 29 U.S.C. secs. 1104(a)(1)(B)–(C), 1106(a)(1)(B), (D) (1976).

211. The defendant Schmoutey was a trustee of the Pension Trust from its inception in 1971 until 1981; accordingly, the above findings of fact concerning the con-

duct and knowledge of the Pension Trust trustees as a group are specifically found as facts concerning the conduct and knowledge of Schmoutey.

212. The Secretary seeks to have Schmoutey enjoined from serving as a trustee of an ERISA covered employee benefit plan for a period of five years. This injunctive relief was granted on April 2, 1984, pursuant to a motion for summary judgment.

## XII. CONCLUSIONS OF LAW INCORPORATED BY REFERENCE

213. Any conclusion of law appearing in the above Findings of Fact is by this reference incorporated into the Conclusions of Law set forth below and is deemed to be a conclusion of law.

## CONCLUSIONS OF LAW

### I. JURISDICTION

1. Jurisdiction is based upon both diversity of citizenship and the existence of a substantial federal question. 28 U.S.C. sec. 1332 (1976); 28 U.S.C. sec. 1331 (Supp. V 1981). The plaintiffs' claims are in excess of $10,000 exclusive of interest and costs.

2. This court also has jurisdiction pursuant to ERISA, 29 U.S.C. sec. 1132(e)(1) (1976), and ancillary jurisdiction applicable to cases involving intervention.

3. Venue of this action is proper in this district court pursuant to ERISA, 29 U.S.C. sec. 1132(e)(2) (1976).

### II. THE PARTIES' STATUS UNDER ERISA

4. The Pension Trust is and, at all times since January 1, 1975, has been an employee benefit plan within the meaning of ERISA, 29 U.S.C. sec. 1002(3) (1976); is subject to the coverage of ERISA, 29 U.S.C. sec. 1003(a) (1976); and has been subject to ERISA since January 1, 1975, 29 U.S.C. sec. 1114(a) (1976).

5. Since January 1, 1975, the various trustees of the Pension Trust have been, during the time they held office, fiduciaries

within the meaning of ERISA, 29 U.S.C. sec. 1002(21)(A) (1976).

6. The Secretary is authorized to bring this civil action under ERISA on behalf of the Pension Trust against certain of its trustees and against parties that received or benefited from transfers of Pension Trust assets, namely, Shenker, Murrieta, Sierra, I.J.K., and S & F. *See* 29 U.S.C. sec. 1132(a) (1976).

7. The Pension Trust, which was joined to this suit by the Secretary as an involuntary plaintiff, has independent standing to sue under the Secretary's complaint and amended complaint. *Peoria Union Stock Yards Co. Retirement Plan v. Penn Mutual Life Insurance Co.*, 698 F.2d 320, 326 (7th Cir.1983); 29 U.S.C. sec. 1132(d) (1976); *cf. Fentron Industries, Inc. v. National Shopmen Pension Fund*, 674 F.2d 1300, 1303–05 (9th Cir.1982) (there is nothing in the legislative history to suggest that the list of parties empowered to sue under section 1332 is exclusive).

8. M & R Investment, as the owner and operator of the Dunes Hotel and Casino, an employer some of whose employees were and are covered by the Pension Trust, was a party in interest at all times from January 1, 1975, through March 30, 1977. *See* 29 U.S.C. sec. 1002(14)(C) (1976).

9. Connector, as owner of 100 percent of the voting stock of M & R, which in turn owned 100 percent of the voting stock of M & R Investment, was, with respect to the Pension Trust, a party in interest at all times from January 1, 1975, through March 30, 1977. *See* 29 U.S.C. sec. 1002(14)(E) (1976).

10. Shenker, as a director of M & R Investment, was, with respect to the Pension Trust, a party in interest at all times from March 3, 1975, through March 30, 1977. *See* 29 U.S.C. sec. 1002(14)(H) (1976).

11. Shenker, as a director of Connector, was, with respect to the Pension Trust, a party in interest at all times from March 3, 1975, through March 30, 1977. *See* 29 U.S.C. sec. 1002(14)(H) (1976).

12. Shenker, as a more than 10 percent indirect shareholder of Connector, was, with respect to the Pension Trust, a party in interest at all times from January 1, 1975, through March 30, 1977. *See* 29 U.S.C. sec. 1002(14)(H) (1976).

13. California, as a wholly-owned subsidiary of Connector, was, with respect to the Pension Trust, a party in interest at all times from January 1, 1975, through March 30, 1977. *See* 29 U.S.C. sec. 1002(14)(G) (1976).

14. Murrieta, as a 10 percent or more joint venturer in profits of California, a wholly-owned subsidiary of Connector, was, with respect to the Pension Trust, a party in interest at all times from January 1, 1975, through March 30, 1977. *See* 29 U.S.C. sec. 1002(14)(I) (1976).

15. I.J.K., as a more than 10 percent indirect shareholder of Connector, was, with respect to the Pension Trust, a party in interest at all times from January 1, 1975, through March 30, 1977. *See* 29 U.S.C. sec. 1002(14)(H) (1976).

15A. On January 1, 1975, the date ERISA became effective, Murrieta was in default on the $2,000,000 and $5,000,000 loans, and Sierra was in default on the $8,000,000 loan. Under the loan agreements, the trustees from and after January 1, 1975, had the legal right to accelerate the principal and interest Murrieta owed the Pension Trust and to foreclose on the collateral for those loans. They also had the legal right to sue Shenker on his guarantee of the $8,000,000 loan. By failing to exercise their rights to accelerate and foreclose, the trustees indirectly extended further credit to Murrieta, a party in interest, in violation of 29 U.S.C. sec. 1106(a)(1)(B) (1976). By failing to pursue Shenker on his guarantee of the $8,000,000 loan, the trustees indirectly benefited Shenker, a party in interest, in violation of 29 U.S.C. sec. 1106(a)(1)(D) (1976). In addition to their imprudent failure to attempt to collect what the defendants owed the Pension Trust, in violation of 29 U.S.C. sec. 1104(a)(1)(B) (1976 & Supp. V 1981), the trustees entered into the First Addendum Loan Agreement, which extended further credit to Sierra and Murrieta, in violation of 29 U.S.C. secs. 1104, 1106 (1976 & Supp. V 1981).

## III. THE FIRST AND SECOND ADDENDA ARE SUBJECT TO ERISA

16. The only dates that are relevant to the issue of whether the First and Second Addenda constituted transactions prohibited by ERISA, 29 U.S.C. sec. 1106 (1976), are the dates on which they were executed, July 28, 1975, and December 1, 1975, respectively. *M & R Investment Co. v. Fitzsimmons*, 484 F.Supp. 1041, 1057–58 (D.Nev.1980), *aff'd*, 685 F.2d 283 (9th Cir. 1983). Both of these agreements were executed after the effective date of ERISA (January 1, 1975), 29 U.S.C. sec. 1114(a) (1976).

17. Because the First Addendum provided for additional loans up to $1,350,-000 and new letters of credit up to $1,800,-000 it was *not* a "renewal" of a binding contract in effect on July 1, 1974, as defined by ERISA, 29 U.S.C. sec. 1114(c)(1) (1976), and was therefore subject to the prohibited transaction provisions of ERISA, *e.g.* 29 U.S.C. sec. 1106(a)(1)(B), (D) (1976); *see also Freund v. Marshall & Ilsley Bank*, 485 F.Supp. 629, 638 (W.D. Wis.1979) (a pre-ERISA practice of making loans to a party does not justify any exception under the transition rule of ERISA for loans made to the same party after the effective date of ERISA).

18. As of December 1, 1975, the Pension Trust was legally entitled to accelerate all principal and interest due from Murrieta under the $2 million and $5 million loans because the interest payments of Murrieta on those loans were delinquent.

19. As of December 1, 1975, the Pension Trust was legally entitled to accelerate all principal and interest due from Sierra under the $8 million and the First Addendum loans because the interest payments of Sierra had been delinquent for more than 30 days after notice from the Pension Trust.

20. The Second Addendum unfavorably renewed rather than accelerated all principal and interest due under the $2 million and the $5 million loans to Murrieta and the $8 million and the First Addendum loans to Sierra.

21. The unfavorable renewal by the Second Addendum of the Murrieta $2 million and $5 million loans and of the Sierra $8 million and First Addendum loans constituted new extensions of credit of the entire principal and interest under these four loans to Murrieta and Sierra.

22. Although the $2 million and the $5 million loans to Murrieta and the $8 million loan to Sierra were binding contracts in effect on July 1, 1974, the renewals of those loans by the Second Addendum did not remain as favorable to the Pension Trust as arm's-length transactions with an unrelated party would have been. Therefore, the transition rule of ERISA, 29 U.S.C. sec. 1114(c)(1) (1976), does not exempt the unfavorable renewal of the $2 million, the $5 million, and the $8 million loans effectuated by the Second Addendum from the prohibited transactions provisions of ERISA, *e.g.* 29 U.S.C. sec. 1106 (1976); *see also Freund* 485 F.Supp. at 638–39 (a pre-ERISA loan must remain at least as favorable to a pension trust as an arm's-length transaction with an unrelated party in order to maintain its exemption under ERISA).

23. To the extent that the Second Addendum provided for additional loans up to $16,571,000 over and above the prior four loans, it imposed an entirely new and different obligation on the Pension Trust. The covenant for additional loans therefore was *not* a renewal of a binding contract in effect on July 1, 1974, pursuant to ERISA, 29 U.S.C. sec. 1114(c)(1) (1976), and consequently was subject to the prohibited transaction sections of ERISA, *e.g.* 29 U.S.C. sec. 1106(a)(1)(B), (D) (1976). The term "renewal" simply means an extension of time in which to discharge an obligation. If the obligation changes, it is not a renewal: an old obligation cannot be reestablished by the creation of a new obligation that is different in character. *Campbell River Timber Co. v. Vierhus*, 86 F.2d 673, 675–76 (9th Cir.1936); *see also Freund*, 485 F.Supp. at 638 (W.D.Wis.1979) (a pre-ERISA practice of making loans to a party does not justify any exception under the transition rule of ERISA for loans made to the same party after the effective date of ERISA).

24. All of the loans by the Pension Trust to Sierra and Murrieta, including, first, the unfavorable renewals of the $2 million, the $5 million, and the $8 million loans granted pursuant to the Second Addendum and, second, the additional monies to be lent under the Second Addendum are subject to the rules of prudence in ERISA, 29 U.S.C. sec. 1104(a)(1)(B) (1976), diversification, 29 U.S.C. 1104(a)(1)(C) (1976), and prohibited transactions, 29 U.S.C. sec. 1106 (1976). *Cf. Freund*, 485 F.Supp. at 638 (even if, for the sake of argument, the transition rule applies, a trustee must conform with the basic fiduciary responsibility rules).

## IV. KNOWLEDGE OF THE TRUSTEES

25. The defendants' prohibited transaction defense that the trustees did not know or should not have known that Murrieta, I.J.K., and Shenker were parties in interest benefiting from the First or Second Addenda is without merit.

26. The evidence shows that as of July 28, 1975, and December 1, 1975, the trustees actually knew that (1) Shenker was a part-owner of the Dunes, (2) the Dunes was a contributing employer to the Pension Trust, (3) and Shenker and his wholly-owned and controlled corporations I.J.K. and Murrieta would benefit from the First and Second Addenda. This knowledge is all that is required by the prohibited transaction provisions of ERISA. *Marshall v. Kelly*, 465 F.Supp. 341, 351 (W.D.Okla. 1978); 29 U.S.C. sec. 1106(a) (1976).

27. In addition, knowledge that Murrieta, I.J.K., and Shenker were parties in interest benefiting from the First and Second Addenda is imputed to the trustees because

a thorough investigation is mandated in any significant transaction to determine if the borrower or a beneficiary of the loans is a party in interest. *M & R Investment Co. v. Fitzsimmons*, 484 F.Supp. 1041, 1056–57 (D.Nev.1980), *aff'd*, 685 F.2d 283 (9th Cir.1982); *Kelly*, 465 F.Supp. at 351. All the information required to identify Shenker, Murrieta, and I.J.K. as parties in interest to the Pension Trust was available to the trustees in public documents (such as information required to be filed with the Securities and Exchange Commission) and in other documents such as the borrower's financial statements.

■ 28. The issue of whether the trustees knew or should have known that the First and Second Addenda would benefit parties in interest is not relevant in determining whether the First and Second Addenda were prohibited transactions. The requirement of knowledge by the trustees, 29 U.S.C. sec. 1106 (1976), is a prerequisite to the imposition of certain penalties on fiduciaries under sections 1109 and 1132, 29 U.S.C. secs. 1109, 1132 (1976). Non-fiduciary recipients of Pension Trust assets such as Shenker, Murrieta, Sierra, and I.J.K. have constructive knowledge that they were receiving Pension Trust assets that will benefit a party in interest. *M & R Investment Co.*, 484 F.Supp. at 1057.

## V. BENEFIT AND CREDIT TO PARTIES IN INTEREST UNDER THE FIRST AND SECOND ADDENDA

29. Under the First Addendum the Pension Trust advanced Sierra $1,350,000 in Pension Trust monies and $1,595,228 in letters of credit and thereby transferred Pension Trust assets to the indirect benefit of a party in interest, namely, Shenker who is the owner of Sierra and the guarantor of the Pension Trust's $8,000,000 loan to Sierra, *see* 29 U.S.C. sec. 1106(a)(1)(D) (1976).

■ 29A. Under the Murrieta First Addendum agreement, the trustees, in the absence of any obligation of the Pension Trust to do so and contrary to the Pension Trust's existing contractual rights against Murrieta (1) granted Murrieta a moratori-

um on its monthly interest payments, which were then delinquent, and (2) allowed Murrieta's monthly interest payments to be paid with Sierra lot paper rather than cash. The trustees thereby indirectly extended credit to Murrieta, a party in interest, and benefited Shenker, a party in interest, who was the sole owner of Murrieta, in violation of 29 U.S.C. sec. 1106(a)(1)(B), (D) (1976).

30. Under the Second Addendum the Pension Trust unfavorably renewed the delinquent Murrieta $2 million and $5 million loans and agreed to lend Murrieta additional Pension Trust monies up to $1,358,000 for marketing the lots securing the $2 million loan. The Pension Trust thereby indirectly lent money and extended credit to Murrieta, a party in interest, and indirectly benefited a party in interest, namely, Shenker, who is the sole owner of Murrieta, *see* 29 U.S.C. sec. 1106(a)(1)(B), (D) (1976).

31. Under the Second Addendum the Pension Trust unfavorably renewed the delinquent Sierra $8 million and First Addendum loans and agreed to lend Sierra additional monies up to $16,571,000. The Pension Trust thereby indirectly benefited a party in interest, namely, Shenker who along with his family owns Sierra and who is the guarantor of the Pension Trust's $8,000,000 loan and Second Addendum loan to Sierra. The Pension Trust also thereby indirectly benefited I.J.K., a party in interest, which was wholly owned by Shenker, which had received loans approximating $939,000 from Sierra during the funding of the $8 million loan which I.J.K. was not compelled to immediately repay.

One purpose of the prohibited transactions provisions in ERISA is to insulate employee benefit plans from the interest and influence of an employer. *McDougall v. Donovan*, 552 F.Supp. 1206, 1216 (N.D.Ill. 1982). Shenker controlled an employer contributing to the Pension Trust: he was, indirectly, the largest shareholder of the Dunes through I.J.K. and his other holdings. The mere insertion of Sierra, a cor-

poration owned and controlled by Shenker, between Shenker and the Pension Trust failed to insulate the Pension Trust from Shenker who indirectly controlled one of its major contributing employers, the Dunes. The evidence overwhelmingly established that vast indirect financial benefits flowed to Shenker by way of the Second Addendum. *See* 29 U.S.C. sec. 1106(a)(1)(D) (1976).

31A. Shenker, a party in interest to the Pension Trust, indirectly received benefits through the use of Pension Trust assets within the meaning of 29 U.S.C. sec. 1106(a)(1)(B), (D) (1976) because, among other things, the trustees allowed Pension Trust assets to be used to make payments on obligations of companies—e.g., Sierra, S & F Corporation, Palm Development, Murrieta—which obligations had been guaranteed by Shenker and for which he then was contingently liable. Examples include:

(1) The use of Pension Trust assets to make payments on Sierra debts to Valley Bank—the $2,450,000, May 26, 1976, loan guarantee—which Shenker had guaranteed;

(2) The use of Pension Trust assets to make payments on First National Bank of Albuquerque loans which Shenker had guaranteed;

(3) The use of Pension Trust assets to make payments on Valley Bank loans to Murrieta—the Warehouse Line of Credit—which Shenker had guaranteed;

(4) The trustees' committing, as a part of the Sierra First Addendum, Pension Trust assets to secure letters of credit in connection with the Argonaut Insurance Co. performance bonds on Gardnerville units six and seven as to which bonds Shenker was an indemnitor;

(5) The use of Pension Trust assets to pay for the cost of construction improvements required by governmental improvement bonds (the Gardnerville Ranchos Improvement District bonds) which Shenker had guaranteed;

(6) The use of Pension Trust assets for the construction of improvements on projects in which the Pension Trust had no interest but as to which Shenker had both indemnitor obligations and an ownership interest;

(7) The use of Pension Trust assets for the payment of Sierra debts to numerous creditors—e.g., ITT Industrial Credit, Union Investment, Central Telephone Co., to name a very few—which debts had been guaranteed by Shenker;

(8) The use of Pension Trust assets to purchase releases of liability from Stanley Franklin for Shenker, I.J.K., Murrieta, Shenker's law firm, his wife and children and all his business enterprises.

All of the foregoing acts constitute direct or indirect loans, extensions of credit, transfers to or uses by or for the benefit of Shenker, a party in interest, in violation of ERISA, 29 U.S.C. sec. 1106(a)(1)(B), (D) (1976).

## VI. THE FIRST AND SECOND AD-DENDA WERE PROHIBITED TRANS-ACTIONS

32. The First Addendum, under which the Pension Trust advanced $1,350,000 to Sierra and granted Murrieta a moratorium on its interest payments (on the condition that Sierra make Murrieta's payments), constituted an indirect extension of credit between the Pension Trust and Murrieta, a party in interest, in violation of 29 U.S.C. sec. 1106(a)(1)(B) (1976), and an indirect benefit to Shenker, a party in interest, who was the major shareholder of Sierra and the sole owner of Murrieta, in violation of 29 U.S.C. sec. 1106(a)(1)(B), (D) (1976).

33. The Second Addendum on its face constituted an indirect extension of credit between the Pension Trust and Murrieta, a party in interest, because the Second Addendum expressly contemplated that Sierra would then lend part of the proceeds of the Pension Trust loan to Murrieta, a party in interest in violation of 29 U.S.C. sec. 1106(a)(1)(B) (1976).

34. The Second Addendum constituted an indirect extension of credit between the Pension Trust and Shenker, a

party in interest, in violation of section 1106(a)(1)(B) and an indirect transfer of plan assets to or use by or for the benefit of Shenker a party in interest in violation of 29 U.S.C. sec. 1106(a)(1)(B), (D) (1976).

35. The Second Addendum constituted an indirect extension of credit between the Pension Trust and I.J.K., a party in interest, in violation of section 1106(a)(1)(B) and an indirect transfer of plan assets to or use by or for the benefit of I.J.K., a party in interest, in violation of 29 U.S.C. sec. 1106(a)(1)(B), (D) (1976).

## VII. SHENKER AND HIS COMPANIES KNOWINGLY PARTICIPATED IN THE TRUSTEES' VIOLATION OF THEIR DUTY TO DIVERSIFY THE INVESTMENTS OF THE PENSION TRUST

36. At the time the trustees executed the Second Addendum the outstanding loans from the Pension Trust to Murrieta and Sierra constituted $16,692,515 of the approximately $29 million in total assets of the Pension Trust, or approximately 57 percent of the total assets of the Pension Trust. Both companies were engaged in high-risk real estate development and sales programs and were substantially or wholly-owned and controlled by Shenker.

37. The Second Addendum not only renewed the outstanding loans to Murrieta and Sierra but also called for additional loans to them during the following three years of up to $16,571,000, making the total anticipated principal in excess of $33 million.

38. By executing the Second Addendum the trustees failed to diversify the investment of the Pension Trust so as to minimize the risk of large losses. *See* 29 U.S.C. sec. 1104(a)(1)(C) (1976); *Marshall v. Glass/Metal Association and Glaziers and Glass Workers Pension Plan,* 507 F.Supp. 378, 383–84 (D.C.Hawaii 1980) [hereinafter cited as *Glaziers* ].

39. The defendants have failed to show that under the circumstances in which the Second Addendum was executed it was clearly prudent not to diversify the investments of the Pension Trust instead of lending more money to Shenker's companies.

*See Glaziers,* 507 F.Supp. at 384 (the burden is upon the defendants to justify a failure to diversify). To the contrary, the evidence revealed that the trustees' execution of the Second Addendum was grossly imprudent.

40. The trustees who executed the Second Addendum violated their fiduciary duty to diversify the investments of the Pension Trust so as to minimize the risk of large losses when they executed the Second Addendum. *See* 29 U.S.C. · sec. 1104(a)(1)(C) (1976).

41. Sierra, I.J.K., and Shenker had actual or constructive knowledge of the financial records and conditions of Sierra and Murrieta, of the amounts lent by the Pension Trust to them under the four prior loans and the amount contemplated under the Second Addendum, and of the total assets available to the Pension Trust.

42. Sierra, I.J.K., and Shenker, therefore, knowingly participated in the trustees' violation of their fiduciary duty to diversify the assets of the Pension Trust so as to minimize the risk of large losses. *See* 29 U.S.C. sec. 1104(a)(1)(C) (1976).

42A. The Secretary has alleged that the defendants are liable for the trustees' violations or ERISA, 29 U.S.C. secs. 1104(a)(1)(B), (C), 1106(a)(1) (1976 & Supp. V 1981), because they knowingly participated in such violations. The court already has concluded that the Secretary is empowered under ERISA to seek relief against non-fiduciaries.

As to the defendants Shenker, I.J.K., and Murrieta, their knowing participation constitutes an additional basis of liability under ERISA since they are liable for the Pension Trust's losses arising out of the transactions in issue as parties in interest to the Pension Trust.

The court concludes that proof of alter ego is not required under any of the ERISA claims.

42B. Under ERISA, liability may be imposed upon a non-fiduciary for know-

ingly participating with a fiduciary in a breach of trust. *Fremont v. McGraw Edison*, 606 F.2d 752, 759 (7th Cir.1979), *cert. denied*, 445 U.S. 951, 100 S.Ct. 1599, 63 L.Ed.2d 786 (1980); *McDougall v. Donovan*, 539 F.Supp. 596, 598–99 (D.Ill.1982); *Donovan v. Bryans*, 566 F.Supp. 1258, 1266–67 (E.D.Pa.1983); *Thornton v. Evans*, 692 F.2d 1064, 1078 (7th Cir.1982). As *Fremont*, *McDougall*, and *Bryans* make clear, this principle is applicable to actions brought pursuant to ERISA.

■ 42C. The liability of a knowing participant in a fiduciary breach is joint and several with the breaching fiduciary. *Fremont v. McGraw Edison*, 606 F.2d at 759; Bogert, *Trusts and Trustees*, sec. 868, at 79, 82–83 (rev. 2d ed. 1982). *See also Restatement (Second) of Trusts* secs. 291, 295, 326 (1959).

42D. At common law, non-fiduciaries are liable for inducing a fiduciary to make an unlawful investment. *Kinney v. Lindgren*, 373 Ill. 415, 26 N.E.2d 471, 474 (Ill. 1940), and for unlawfully borrowing trust funds. *Malmud v. Blackman*, 251 App. Div. 192, 295 N.Y.S. 398, 400 (1937), *aff'd*, 278 N.Y. 658, 16 N.E.2d 391 (N.Y.1938).

■ 42E. A third-party participant in a breach of trust is "liable ... for any loss caused by breach of trust" even if such third party is not a transferee of the trust asset involved in the particular transaction. *Restatement (Second) of Trusts* sec. 326 (1959). On the other hand, at common law, the receipt of trust assets by a third party resulting from a fiduciary breach constitutes sufficient participation for purposes of establishing knowing participation. *See Malmud v. Blackman*, 295 N.Y.S. at 400; *Anderson v. Daly*, 38 App.Div. 505, 56 N.Y.S. 511 (1899).

■ 42F. The elements of knowing participation in a breach of fiduciary duty are:

(a) an act or omission which furthers or completes the breach, and

(b) actual or constructive knowledge at the time that the transaction amounted to a breach or the legal equivalent of such knowledge.

*See Rippy v. Denver United States National Bank*, 273 F.Supp. 718, 743 (D.Colo. 1967); Bogert, *Trusts and Trustees* sec. 901, at 58–59 (rev. 2d ed. 1982); *Restatement (Second) of Trusts*, sec. 326 (1959); 76 Am.Jur.2d *Trusts* sec. 309, at 529–30 (1975).

■ 42G. There is no element of intent to be proved in connection with a claim of knowing participation in a fiduciary breach. *Duckett v. National Mechanics of Baltimore*, 86 Md. 400, 38 A. 983, 984 (1907). *See also Smith v. Ayer*, 101 U.S. 320, 325, 25 L.Ed. 955 (1879) ("[H]owever free from intentional wrong, they must bear the responsibility of a mistaken judgment ....").

42H. The common law of trusts imposes particular duties and obligations on parties which deal with trusts, including the following.

(a) "The law requires of those dealing with a trustee the exercise of good faith toward the beneficiaries of the trust ...." 76 Am.Jur.2d *Trusts*, sec. 309, at 529 (1975).

(b) "[P]ersons knowingly dealing with trustees are under a duty of inquiry ...." *Id.* at 530.

However, the Secretary need not rely upon either of the foregoing propositions to establish the liability of Shenker, Sierra, I.J.K. and Murrieta on the ground of their knowing participation. The conclusion of the court that these defendants were knowing participants in the fiduciary breaches of the trustees also does not rely to any extent on the foregoing trust law principles. The conclusions that these defendants knowingly participated in violations of ERISA are set forth more fully above.

## VIII. SHENKER AND HIS COMPANIES KNOWINGLY PARTICIPATED IN THE TRUSTEES' VIOLATION OF THEIR DUTY TO PRUDENTLY INVEST PLAN ASSETS

43. At the time the trustees executed the Second Addendum, they knew or should have known the following:

(1) Both Murrieta and Sierra had been in default under the prior four loans for failure to make monthly interest payments since at least December 31, 1974; the delinquent interest as of December 1, 1975, totalled $363,125 for Murrieta and $346,578 for Sierra.

(2) The Pension Trust was legally entitled under the terms of the prior loan agreements with Murrieta and Sierra to (1) declare all principal and interest under these loans due and owing, (2) institute suit against Murrieta and Sierra for nonpayment and for foreclosure on the collateral securing the loans, and (3) sue Shenker as guarantor of the loan to Sierra.

(3) The collateral securing the prior four loans to Sierra and Murrieta was substantially insufficient to repay those loans since Murrieta and Sierra had not fully developed and marketed the collateral as assumed in the appraisals submitted to the Pension Trust by Shenker in connection with the loans.

(4) One of the primary reasons the collateral securing the prior loans to Sierra and Murrieta was not fully developed and marketed was that the bulk of the proceeds under those loans had been used by Shenker for purposes other than the development and marketing of that collateral.

(5) The additional collateral pledged under the Second Addendum, together with the collateral provided under the four prior loans to Sierra and Murrieta, was substantially insufficient to secure repayment of the entire principal and interest contemplated to be advanced to Murrieta and Sierra.

(6) Sierra and Murrieta had cumulative losses since their inceptions of at least $4,073,231 and $12,504,657, respectively, and had comparable capital deficits. The auditors of Sierra and Murrieta had qualified their opinions regarding the abilities of Sierra and Murrieta to continue as going concerns.

(7) The lot sales program of Sierra had been suspended by HUD and the contractor of Sierra had defaulted without completing approximately $2 million worth of improvements at units 6 and 7.

(8) And the Pension Trust had already loaned approximately 57 percent of its total assets to Shenker's companies. The additional loans would compound the trustees' failure to diversify Pension Trust assets and thereby increase the risk of a large loss from the loans for the high risk real estate ventures of Murrieta and Sierra.

44. At the time the trustees executed the Second Addendum, they had failed to secure and evaluate sufficient relevant information regarding the loans, including but not limited to the following:

(1) They had failed to secure and evaluate independent appraisals of the collateral securing all the loans to Murrieta and Sierra.

(2) They had failed to secure and evaluate an independent economic feasibility study by a qualified expert concerning whether it was likely that the net income from the lot sales programs of Sierra and Murrieta contemplated by the Second Addendum would be sufficient to repay all principal and interest on the loans under the Second Addendum.

(3) And they had failed to secure and evaluate an independently audited financial statement on the loan guarantor, Shenker, to determine whether his net worth was of sufficient value to assure repayment of the loans pursuant to his guarantee of the Second Addendum.

45. At the time the trustees executed the Second Addendum they failed to take certain actions and precautions which a prudent man acting in a like capacity and familiar with such matter would have used in the conduct of an enterprise of a like character and with like aims, including but not limited to the following:

(1) The trustees failed to either exercise the rights of the Pension Trust to secure repayment under the prior loans or to obtain additional security having a value, based on independent appraisals, sufficient to repay all advances of credit contemplated under the Second Addendum.

(2) The trustees failed to ascertain from independent, qualified experts whether the unencumbered net worth of the loan guarantor, Shenker, was sufficient to repay any potential deficiency in repayment under the Second Addendum. *See Donovan v. Mazzola*, 716 F.2d 1226, 1232 (9th Cir.1983) (failure to ascertain the identity and value of the security of a loan is a breach of the fiduciary duties under ERISA), *cert. denied*, —— U.S. ——, 104 S.Ct. 704, 79 L.Ed.2d 169 (1984); *Freund v. Marshall & Ilsley Bank*, 485 F.Supp. 629, 636 (W.D. Wis.1979) (a prudent fiduciary under ERISA must demand security sufficient to cover for the risks involved); *Glaziers*, 507 F.Supp. 378, 384 (D.Hawaii 1980) (committing pension plan assets without adequate procedures to evaluate the risks involved is a breach of the fiduciary duties required of ERISA).

(3) The trustees failed to ascertain that the past lot sales performances of Sierra and Murrieta were actually substantially below the sales rate projected by Exhibit "A."

(4) The trustees failed to ascertain from independent, qualified experts whether the income generated by the businesses of the borrowers would be sufficient to repay the loans and extensions of credit by the Pension Trust under the Second Addendum.

(5) And the trustees failed to ascertain that although the lot paper projected by Exhibit "A" to the Second Addendum to be assigned to the Pension Trust constituted the principal means of repaying all the loans, actually the lot paper would not be sufficient to repay all principal nor any of the interest on the total loans. The Second Addendum therefore projected a multi-million dollar deficiency even assuming full and timely performance of the Second Addendum by Sierra and Murrieta.

■■■■ 46. The trustees who executed the Second Addendum failed to discharge their duty to manage and invest plan assets with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. *See* 29 U.S.C. sec. 1104(a)(1)(B) (1976).

47. Sierra, I.J.K., and Shenker had actual or constructive knowledge of the following facts at the time of the execution of the Second Addendum:

(1) They had knowledge of the financial records, sales histories, and financial conditions of Sierra and Murrieta.

(2) They had knowledge of Shenker's personal financial condition and net worth.

(3) They knew that the proceeds from the prior four loans to Murrieta and Sierra were applied to purposes unrelated to the businesses of Sierra and Murrieta or to the development and sale of the collateral securing those loans.

(4) They had knowledge of the material misrepresentations made by Shenker and other representatives of Sierra and Murrieta to the trustees in connection with all five loans to Murrieta and Sierra.

(5) They had knowledge that the collateral securing the Second Addendum was insufficient to secure a complete repayment of principal and interest under the Second Addendum.

(6) They knew that the projections contained in Exhibit "A" to the Second Addendum concerning the lot paper to be generated by the sales programs of Sierra and Murrieta were insufficient to fully repay the principal and interest on all loans to be extended to those companies.

(7) They knew that the actual sales histories of Sierra and Murrieta revealed a rate of lot sales far below those projected by Exhibit "A" to the Second Addendum.

(8) They knew that Exhibit "A" to the Second Addendum projected the sale of approximately 1,000 more lots than Sierra and Murrieta had available to sell on behalf of the Pension Trust.

(9) They knew the total amount of the loans contemplated by the Second Addendum and the prior loans to Murrieta and Sierra.

(10) And they had knowledge of the total assets available to the Pension Trust as of the execution of the Second Addendum and the employers' contribution rate to the Trust.

48. Sierra, I.J.K., and Shenker, by virtue of their actual and constructive knowledge regarding themselves, Murrieta, and the Pension Trust, knowingly participated in the trustees' failure to discharge their fiduciary duty to manage and invest the Pension Trust assets in a prudent and diligent manner. *See* 29 U.S.C. sec. 1104(a)(1)(B) (1976).

48A. Additionally, Shenker, I.J.K., and Murrieta had actual or constructive knowledge of facts which were more than sufficient to disclose to them their status as parties in interest to the Pension Trust. Sierra also had actual or constructive knowledge of the facts which made Shenker, I.J.K., and Murrieta parties in interest to the Pension Trust. This conclusion is based on the following considerations, among others.

(a) Shenker, I.J.K. and Murrieta had actual knowledge (or such knowledge was available to them in documents which were prepared by them or on their behalf, or were reviewed by them, or were publicly available) of facts which were more than sufficient to disclose to them their status as parties in interest to the Pension Trust.

(b) Sierra, through its officers and directors—Shenker, Unruh and Pilkington—in particular—had direct and actual knowledge of facts sufficient to disclose the party in interest relationships between Shenker, I.J.K., Murrieta and the Pension Trust.

The knowledge of a director, officer, sole shareholder or controlling person of a corporation is imputable to that corporation. *Phoenix Savings and Loan Inc. v. Aetna Casualty & Surety Co.*, 427 F.2d 862, 869–870 (4th Cir.1970); *cf. Chartrand v. Barney's Club, Inc.*, 380 F.2d 97, 100–01 (9th Cir.1967); *Federal Savings and Loan Insurance Corp. v. Fielding*, 343 F.Supp. 537, 544 (D.Nev.1972); 19 Am.Jur.2d *Corporations* sec. 1263, at 669 (1965). Shenk-er, as a director of Sierra and I.J.K., is chargeable with knowledge respecting their activities which he had the means of knowing and of facts appearing in their books and records. 19 Am.Jur.2d *Corporations* at sec. 1287, at 693–94 (1965).

(c) All of the foregoing defendants had actual knowledge that Pension Trust assets were used, directly or indirectly, in loans, extensions of credit and transfers to Shenker, I.J.K. and Murrieta and that such assets were used for their benefit.

Shenker, I.J.K., Sierra, and Murrieta therefore knowingly participated in the trustees' breach of their duty not to engage in prohibited transactions in violation of ERISA, 29 U.S.C. sec. 1106(a)(1)(B), (D) (1976).

## IX. IN VIEW OF SIERRA'S MATERIAL BREACHES OF THE SECOND ADDENDUM, FURTHER FUNDING OF SIERRA WOULD HAVE BEEN IMPRUDENT UNDER ERISA

49. As of March 30, 1977, the Pension Trust was contractually excused from lending further funds to Sierra under the Second Addendum because of several material breaches by Sierra, including but not limited to the following:

(1) Sierra substantially failed to attain the lot sales projections set forth in Exhibit "A." The lot sales constituted the principal means of repayment contemplated by the parties to the Second Addendum.

(2) Sierra failed to pay approximately $2,058,155 in accrued monthly interest.

(3) Sierra failed to timely complete the improvements at units six and seven within the costs estimates of Exhibit "A."

(4) And Sierra failed to timely provide the Pension Trust with either annual or quarterly financial statements required by the Second Addendum.

50. In view of the material breaches of the Second Addendum committed by Sierra that contractually excused the Pension Trust from further funding, the trustees would have violated their duty

to prudently invest, diversify, and manage plan assets had they continued funding Sierra after March 30, 1977. *See* 29 U.S.C. sec. 1104(a)(1)(B), (C) (1976); *Donovan v. Mazzola*, 716 F.2d 1226, 1231–32 (9th Cir. 1983) (application of the prudent man test applies to fiduciary responsibilities under ERISA), *cert. denied*, —— U.S. ——, 104 S.Ct. 704, 79 L.Ed.2d 169 (1984); *Glaziers*, 507 F.Supp. 378, 383 (D.Hawaii 1980) (ERISA imposes a separate duty on plan fiduciaries to spread the risk of loss). Therefore the Pension Trust was excused from further funding under the Second Addendum even assuming, for the sake of argument, that the Second Addendum was *not* in violation of ERISA as of its execution on December 1, 1975.

50A. The Second Addendum loan contract violated both ERISA section 404, because it was a grossly imprudent use of Pension Trust assets, and section 406, because it was a prohibited transaction which benefited parties in interest. The defendants argued that if the Second Addendum is an illegal contract because it violates ERISA, their duty to repay the Pension Trust is therefore unenforceable.

▆▆▆ For the reasons stated hereafter, the court has concluded that the illegality under ERISA of the Second Addendum is not a bar to the enforcement of defendants Sierra and Shenker's contract obligations thereunder to repay the Pension Trust.

First, as the Supreme Court has made clear in *Kelly v. Kosuga*, 358 U.S. 516, 520, 79 S.Ct. 429, 431, 3 L.Ed.2d 475 (1959), and *Kaiser Steel Corporation v. Mullins*, 455 U.S. 72, 82, 102 S.Ct. 851, 858, 70 L.Ed.2d 833 (1982), the conclusion that a contract contains promises which require violations of federal law does not require the further conclusion that all promises in such contract are unenforceable by the courts. The prohibition is limited to an enforcement of promises which requires a party to perform an act in violation of law. *Kelly v. Kosuga*, 358 U.S. 516, 520, 79 S.Ct. 429, 431, 3 L.Ed.2d 475 (1959); *Kaiser Steel Corporation v. Mullins*, 455 U.S. 72, 82, 102 S.Ct. 851, 858, 70 L.Ed.2d 833 (1982). The en-

forcement of a promise which does not require a party to act unlawfully is not prohibited. *Kelly v. Kosuga*, 358 U.S. 516, 520, 79 S.Ct. 429, 431, 3 L.Ed.2d 475 (1959), and *Kaiser Steel Corporation v. Mullins*, 455 U.S. 72, 82, 102 S.Ct. 851, 858, 70 L.Ed.2d 833 (1982).

As to the defendants' promise to repay, there is nothing in ERISA which prohibits any person, including a party in interest, from paying debts owed to an ERISA plan. Any such conclusion, furthermore, is directly contrary to the express intent and purpose of Congress, in enacting ERISA, to enhance and secure the protection of the assets of ERISA plans for the benefit of participants and beneficiaries. 29 U.S.C. sec. 1001 (1976); cf. *Eaves v. Penn*, 587 F.2d 453, 457 (10th Cir.1978). It is equally evident that the result sought by defendants would have undesirable consequences. For example, parties in interest could acquire an immunity against the performance of their obligations under contracts with ERISA plans on the argument that such contracts are illegal.

The court, therefore, on the basis of *Kelly v. Kosuga*, and *Kaiser Steel Corporation v. Mullins*, and consistent with the express purpose of ERISA, concludes that the Pension Trust could not lawfully continue to advance funds under the Second Addendum loan and that the defendants Shenker and Sierra are bound by their obligations under that agreement, and in Shenker's case, his guarantee, to repay Sierra's debt to the Pension Trust.

## X. THE LOAN AGREEMENT BETWEEN VALLEY BANK, SIERRA, AND THE PENSION TRUST VIOLATED ERISA

▆▆▆ 51. The loan agreement between Valley Bank, Sierra and the Pension Trust executed on or about May 25, 1976, constituted, first, a prohibited transaction benefiting a party-in-interest, Shenker, in violation of section 1106(a)(1)(B) and (D); second, a failure to diversify plan assets in violation of section 1104(a)(1)(C); and third, an imprudent transaction in violation of

section 1104(a)(1)(B). *See* 29 U.S.C. secs. 1104(a)(1)(B)–(C), 1106(a)(1)(B), (D) (1976).

## XI. SHENKER, I.J.K., AND SIERRA KNOWINGLY PARTICIPATED IN THE TRUSTEES' FAILURE TO DISCHARGE THEIR FIDUCIARY DUTIES OF DIVERSIFICATION, PRUDENCE, AND AVOIDANCE OF PROHIBITED TRANSACTIONS

■ 52. Shenker, I.J.K., and Sierra knowingly participated in the trustees' failure to discharge their fiduciary duties under section 1104(a)(1)(B) and (C) and section 1106(a)(1)(B) and (D) regarding the First Addendum; the Second Addendum; and the loan agreement between Valley Bank, Sierra, and the Pension Trust. 29 U.S.C. secs. 1104(a)(1)(B)–(C), 1106(a)(1)(B), (D) (1976).

## XII. COUNTERCLAIMS AND AFFIRMATIVE DEFENSES

### A. The Counterclaims of Shenker and Sierra Against the Pension Trust are Without Merit

■ 53. The Second Addendum violated section 1104(a)(1)(B)–(C) and section 1106(a)(1)(B) and (D) as of the time of its execution on December 1, 1975, and as of the termination of funding on or about March 30, 1977. 29 U.S.C. secs. 1104(a)(1)(B)–(C), 1106(a)(1)(B), (D) (1976). Therefore, counts number one of the counterclaims, as amended, filed by Sierra and Shenker against the Pension Trust, which allege that the Pension Trust breached the Second Addendum by terminating funding, were dismissed with prejudice and these defendants shall take nothing under counts number one of their counterclaims.

■ 54. Count number two of the counterclaim of Sierra alleges that the Pension Trust and its investment managers breached their purported duty to preserve the alleged values of the properties that Sierra transferred to the Pension Trust and thereby damaged Sierra. The trustees of the Pension Trust owed their exclusive, undivided loyalty and fiduciary duty to preserve and manage the assets of the Pension Trust solely to the Pension Trust's participants and beneficiaries and not to third parties such as Sierra. *See, e.g., Freund v. Marshall & Ilsley Bank*, 485 F.Supp. 629, 639 (D.Wis.1979); 29 U.S.C. secs. 1103(c), 1104(a) (1976). Sierra, therefore, had no standing to assert a cause of action against the Pension Trust for damages incurred due to alleged mismanagement of Pension Trust assets.

In addition, Sierra and Shenker were given net credits for each property transferred to the Pension Trust as of the date of its transfer. Any alleged failure to preserve the values of those properties, therefore, could damage only the Pension Trust, not Sierra nor Shenker. Count number two of the counterclaim of Sierra against the Pension Trust was, therefore, dismissed and Sierra shall take nothing thereby.

■ 55. Because this counterclaim was dismissed, Shenker, as stockholder of Sierra and as guarantor of the repayment of the funds advanced to it by the Pension Trust, cannot, as a matter of law, assert on his behalf any affirmative damages caused to his principal, Sierra. *Arctic Contractor, Inc. v. State*, 573 P.2d 1385, 1386–87 (Alaska 1978); *cf. Von Brimer v. Whirlpool Corp.*, 536 F.2d 838, 846 (9th Cir.1976) (a shareholder may not maintain an action on his own behalf for a wrong done by a third person to a corporation on the theory that such wrong devalued his stock).

■ 56. Sierra and Shenker have failed to introduce any competent, unspeculative evidence that they were damaged by the termination by the Pension Trust of funding under the Second Addendum or the alleged mismanagement of the collateral for the loans. There being no proof of damages, the counterclaims must fail. *Restatement (Second) of Contracts*, sec. 352; *accord Eaton v. J.H. Inc.*, 94 Nev. 446, 450, 581 P.2d 14 (1978).

### B. Affirmative Defenses

56A. On September 16, 1983, the court granted the plaintiff Secretary of Labor's

motion to strike a portion of the Second Affirmative Defense, and to strike the Third, Ninth, Tenth, Eleventh, Twelfth, Thirteenth, Fourteenth, Sixteenth, Seventeenth, Eighteenth, Nineteenth, Twentieth, Twenty-first, Twenty-fifth, and Twenty-sixth Affirmative Defenses of Shenker's Answer to Plaintiff's Amended Complaint, and the corresponding affirmative defenses of I.J.K. and Sierra ("affirmative defenses"). The following conclusions of law are the grounds upon which the court struck those affirmative defenses.

56B. The affirmative defenses are all insufficient as a matter of law to prevent the Secretary from recovering on his claims and therefore should be stricken. *Narragansett Tribe of Indians v. Southern Rhode Island Development Corp.,* 418 F.Supp. 798, 802 (D.R.I.1976).

■ 56C. The ERISA statute of limitations does not bar the Secretary's claims (Second Affirmative Defense). The briefest limitations period provided by ERISA is three years, 29 U.S.C. sec. 1113(a)(2) (1976), and cannot bar any ERISA claim brought on or prior to January 1, 1978. *Katsaros v. Cody,* 568 F.Supp. 360, 370 (E.D.N.Y.1983). The Secretary filed this action on March 30, 1977.

■ 56D. This court has jurisdiction to determine the Secretary's ERISA claims (Third Affirmative Defense). This court's jurisdiction arises under, alternatively, 29 U.S.C. sec. 1132(e)(1) (1976) and 28 U.S.C. secs. 1331, 1345 (1976 & Supp. V 1981).

56E. The Ninth Affirmative Defense, which alleges inadequate investigation and bad faith prosecution by the Department, must be stricken because it erroneously assumes that the Secretary must have reasonable cause to believe a violation exists before filing suit under ERISA. ERISA contains no such express or implied reasonable cause requirement. *See* 29 U.S.C. secs. 1132(a), 1134(a) (1976).

56F. Shenker's self-styled Tenth, Eleventh, Twelfth, Thirteenth and Fourteenth Affirmative Defenses all seek to bar the Secretary's recovery because the Secretary

allegedly breached a supposed fiduciary duty to the Pension Trust. This theory is untenable as a matter of law.

■ 56G. Shenker's Fifteenth Affirmative Defense is that the Secretary's failure to issue various ERISA regulations violates Fifth Amendment due process and thus bars the Secretary's ERISA claims. ERISA is constitutional and therefore is enforceable in the absence of regulations. *See generally Nachman Corp. v. PBGC,* 446 U.S. 359, 100 S.Ct. 1723, 64 L.Ed.2d 354 (1980); *Hewlett-Packard Co. v. Barnes,* 425 F.Supp. 1294 (N.D.Cal.1977), *aff'd,* 571 F.2d 502 (9th Cir.), *cert. denied,* 439 U.S. 831, 99 S.Ct. 108, 58 L.Ed.2d 125 (1978).

■ 56H. The Secretary's decisions respecting whether or how to investigate cannot bar an ERISA enforcement suit (Sixteenth Affirmative Defense). ERISA does not require an investigation before the Secretary files an action to enforce its provisions. 29 U.S.C. secs. 1132(a), 1134(a) (1976). The Secretary's investigation also has no relevance to whether the transactions in issue here violated ERISA.

56I. There is no merit to Shenker's Seventeenth Affirmative Defense, wherein he contends that provisions of ERISA, 29 U.S.C. secs. 1002, 1104, 1106 (1976 & Supp. V 1981) violate Fifth Amendment due process because they are vague and embody irrebuttable presumptions. ERISA is constitutional. *See, e.g., Nachman Corp. v. PBGC,* 446 U.S. 359, 100 S.Ct. 1723, 64 L.Ed.2d 354 (1980); *Pension Benefit Guaranty Corp. v. Ouimet Corp.,* 470 F.Supp. 945, 954–58 (D.Mass.1979) *aff'd,* 630 F.2d 4 (1st Cir.1980), *cert. denied,* 450 U.S. 914, 101 S.Ct. 1356, 67 L.Ed.2d 339 (1981); *Hewlett-Packard Co. v. Barnes,* 425 F.Supp. 1294 (N.D.Cal.1977), *aff'd,* 571 F.2d 502 (9th Cir.), *cert. denied,* 439 U.S. 831, 99 S.Ct. 108, 58 L.Ed.2d 125 (1978).

■ 56J. ERISA's fiduciary standards are based, according to express congressional intent, on the pre-existing and extensive common law of trusts. *E.g., Eaves v. Penn,* 587 F.2d 453, 457 (10th Cir.1978). ERISA, therefore, has sufficiently specific

meaning for Fifth Amendment due process purposes.

■ 56K. Assuming that the prohibited transactions defined in ERISA, 29 U.S.C. sec. 1106 (1976), create irrebuttable presumptions, that provision remains constitutional. Congress can create constitutionally valid irrebuttable presumptions for the purpose of providing reasonable remedies to economic problems. *Weinberger v. Salfi*, 422 U.S. 749, 782–85, 95 S.Ct. 2457, 2475–77, 45 L.Ed.2d 522 (1975); *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 22–24, 96 S.Ct. 2882, 2895–97, 49 L.Ed.2d 752 (1975).

56L. In any event, 29 U.S.C. sec. 1106 (1976) does not create an absolute bar to the transactions that it describes. ERISA provides for a procedure through which the Secretary of Labor can exempt such transactions from the prohibition of 29 U.S.C. sec. 1106 (1976). 29 U.S.C. sec. 1108 (1976 & Supp. V 1981). That procedure is implemented by regulations which were promulgated on April 28, 1975. 40 Fed.Reg. 18,-471 (1975).

■ 56M. Although the defendants plead laches as an affirmative defense, laches is unavailable against an enforcement suit brought by the government. *E.g.*, *Guaranty Trust Co. v. U.S.*, 304 U.S. 126, 132–33, 58 S.Ct. 785, 788–89, 82 L.Ed. 1224 (1938); *U.S. v. Weintraub*, 613 F.2d 612, 618–19 (6th Cir.1979), *cert. denied*, 447 U.S. 905, 100 S.Ct. 2987, 64 L.Ed.2d 854 (1980).

■ 56N. Defendants can gain nothing from their unclean hands defense. A part of the relief the Secretary seeks is restitution for the Pension Trust participants and beneficiaries. Consequently, the clean hands maxim is inapplicable here because its application would significantly harm an innocent party. *Eaves v. Penn*, 587 F.2d 453, 463 (10th Cir.1978).

■ 56O. The estoppel defense raised by the defendant fails as a matter of law because defendants failed to allege its necessary elements. Presumably, although defendants have pleaded nothing more than

the word "estoppel," they mean here that an estoppel arises as to the Secretary's entitlement to claim that the transactions violated ERISA. However, defendants failed to plead the necessary allegations that (1) the Department of Labor (Department) knew the facts of the transactions prior to defendants' involvement, (2) the Department intended for defendants to rely on its conduct, (3) defendants were ignorant of the facts, and (4) defendants suffered injury by relying on the Department's conduct. *See U.S. v. Ruby Co.*, 588 F.2d 697, 703 (9th Cir.), *cert. denied*, 442 U.S. 917, 99 S.Ct. 2838, 61 L.Ed.2d 284 (1979); *California Pacific Bank v. Small Business Administration*, 557 F.2d 218, 224 (9th Cir.1977).

■ 56P. Similarly, as a matter of law, defendants have inadequately pleaded their *in pari delicto* defense. *In pari delicto* refers to a plaintiff's participation in the same alleged wrongdoing as the defendant. *Memorex Corp. v. Int'l Business Machines Corp.*, 555 F.2d 1379, 1382 (9th Cir.1977). Defendants failed to plead that the Secretary participated in any way in the transactions that violated ERISA. Moreover, an *in pari delicto* defense is inappropriate where, as here, its application would harm the persons—participants and beneficiaries—protected by the law claimed to have been violated. *See Memorex Corp.*, 555 F.2d, at 1382–83; *Perma Life Mufflers v. International Parts Corp.*, 392 U.S. 134, 138, 88 S.Ct. 1981, 1984, 20 L.Ed.2d 982 (1967).

■ 56Q. The defendants' mere assertion of "waiver" against the Secretary is legally insufficient to raise that affirmative defense. They have failed to plead that, as is necessary for waiver, the Secretary somehow intended to relinquish his right to enforce ERISA respecting the transactions at issue. *See Boyer v. American Casualty Co.*, 332 U.S. 708, 710–711 (2d Cir.1964); *American Home Assurance Co. v. Harvey's Wagon Wheel, Inc.*, 398 F.Supp. 379, 383–84 (D.Nev.1975) *aff'd*, 554 F.2d 1067 (9th Cir.1977).

56R. The defendants' affirmative defense that the Labor Department filed suit arbitrarily and capriciously is legally untenable. ERISA does not mandate a reasonable cause prerequisite to the filing of an action to enforce its provisions. And there are no conditions precedent to the Secretary's authority to file a suit to enforce ERISA. *See* 29 U.S.C. sec. 1132(a)(2), (5) (1976).

■■■ 56S. There is no legal basis for the Twenty-Fifth Affirmative Defense asserted by Shenker that his tax settlement with the Internal Revenue Service under Title II of ERISA has discharged him and settled all the Secretary of Labor's claims under Title I of ERISA in connection with the transactions at issue in this case.

The Internal Revenue Service is authorized under Title II, 26 U.S.C. sec. 4975 (1976), to impose certain excise taxes on "disqualified persons" (a category analogous to parties in interest as defined in 29 U.S.C. sec. 1102(14) (1976 & Supp. V 1981)) and to settle those tax claims. That tax enforcement authority, however, can have no effect on the Secretary of Labor's independent authority under 29 U.S.C. sec. 1132(a)(2), (5) (1976) to enforce by litigation the fiduciary standards of ERISA. *See McDougall v. Donovan,* 539 F.Supp. 596, 599 (N.D.Ill.1982) (rejecting the argument that the IRS' imposition of an excise tax on a prohibited transaction under 26 U.S.C. sec. 4975 (1976) precludes the Secretary of Labor from seeking restitution for that same prohibited transaction as a violation of 29 U.S.C. sec. 1106 (1976)).

■■■ An agency without authority to enforce a statutory provision cannot bind the agency which does have the authority to enforce that provision. *E.g., U.S. v. Stewart,* 311 U.S. 60, 70, 61 S.Ct. 102, 108, 85 L.Ed. 40 (1940).

■■■ 56T. Shenker's Twenty-Sixth Affirmative Defense is his contention that the Secretary has failed to comply with the Nevada "one action rule" set forth in Nev. Rev.Stat. secs. 40.430, 40.440–.459 (1979 & 1983). This defense is legally inadequate

because, as a matter of law, it cannot lie against the Secretary of Labor suing to enforce ERISA. Shenker does not allege that, within the meaning of any applicable one action statute, the Secretary is a mortgage lender or otherwise holds an interest in the realty at issue here. The Secretary's claims are neither state law claims nor creditor's claims for a deficiency judgment. Finally, a state one action statute cannot limit the Secretary's ERISA enforcement authority because ERISA preempts all state laws insofar as they may relate to an ERISA-covered employee benefit plan. 29 U.S.C. sec. 1144 (1976); *see Alessi v. Raybestos-Manhattan, Inc.,* 451 U.S. 504, 522–26, 101 S.Ct. 1895, 1905–08, 68 L.Ed.2d 402 (1981).

## XIII. POST–TRANSFER EXPENSES

56U. The Secretary asserts that a minimum of $5,769,905 in expenses, incurred by the Pension Trust following the date of its acquisition of the defendants' real property is chargeable to the defendants. The Secretary's basis for this assertion is that the expenses incurred by the Pension Trust after the transfer date of this real property allegedly constituted a loss for or an injury to the Pension Trust requiring restitution by the defendants.

■■■ 56V. The Secretary has failed to provide the court with a satisfactory legal basis to support this proposition. After consideration of the in court arguments and testimony and all the papers filed on the issue, the court concludes that the defendants are not liable for these post-transfer expenses.

56W. Among other fatal deficiencies, the Secretary's argument has a fundamental flaw: the Secretary equates the meaning of "loss" to "expense." These words are distinct in their meanings and usages. "Loss" is synonymous with "damage," "deprivation," "detriment," "injury," and "privation." *Black's Law Dictionary* 851–52 (5th ed. 1979). "Expense" is an outlay, a charge, a cost, or a price. *Id.* at 518. Consequently, it is erroneous to equate these words. If the expenses benefited the

property they cannot be characterized as losses. (The Secretary ignores the possible future recoupment of these post-transfer expenses when the property is sold.)

56X. The court further concludes that allowing the Secretary to prevail on this theory is contrary to the judicial policy of encouraging out of court settlement of claims. Future defendants to ERISA claims would be foolish to transfer collateral to pension plans if these defendants were held liable for post-transfer expenses incurred at the discretion of the Pension Trust.

56Y. The court, in determining the remedy for the violations of ERISA which the Secretary has proved "is mindful that in considering remedies, primary concern should be given to selecting that remedy which is most beneficial to the [Pension Trust], the beneficiaries and participants ...." *Donovan v. Mazzola*, 2 E.B.C. 2115, 2138 (N.D.Cal.1981), *aff'd* 716 F.2d 1226 (9th Cir.1983), *cert. denied*, — U.S. —, 104 S.Ct. 704, 79 L.Ed.2d 169 (1984). Indeed, the courts "have a duty" to enforce the remedy which is most advantageous to the participants and most conducive to effectuating the purposes of the trust. *Donovan v. Mazzola*, 716 F.2d, at 1235 (citing *Eaves v. Penn*, 587 F.2d 453, 462 (10th Cir.1978); *accord, Marshall v. Glass/Metal Assoc. and Glaziers and Glassworkers Pension Plan*, 507 F.Supp. 378, 385 (D.Hawaii 1980); *Freund v. Marshall & Ilsley Bank*, 485 F.Supp. 629, 643 (W.D.Wis. 1979).

56Z. In order to achieve the foregoing result in ERISA cases, the courts have "broad authority to fashion remedies for redressing the interests of participants and beneficiaries." *Donovan v. Mazzola*, 716 F.2d 1226, 1235 (9th Cir.1983); *Eaves v. Penn*, 587 F.2d 453, 462 (10th Cir.1978); *Marshall v. Snyder*, 572 F.2d 894, 901 (2d Cir.1978).

56A'. The Secretary has the authority to seek injunctive relief in connection with the enforcement of ERISA, 29 U.S.C. sec. 1132(a)(5) (1976), and this court has the authority to grant such injunctive relief where the remedies sought are equitable in nature. *Donovan v. Mazzola*, 716 F.2d at 1239–40, n. 9.

56B'. Where an enforcement agency seeks an injunction authorized by statute "it need not prove irreparable injury or the inadequacy of other remedies as required in private injunctive suits ...." *Commodity Futures Trading Commission v. British American Commodity Options Corporations*, 560 F.2d 135, 141 (2d Cir.1977), *cert. denied*, 438 U.S. 905, 98 S.Ct. 3123, 57 L.Ed.2d 1147 (1978).

## XIV. REMEDIES

57. **A. Restitution.**—The Secretary of Labor, on behalf of the Pension Trust, is entitled to restitution from Shenker, I.J.K., and Sierra, jointly and severally, *see* 29 U.S.C. sec. 1132 (1976), in the following amounts:

(1) restitution in the amount of $28,227,-364 from defendant Sierra;

(2) restitution in the amount of $33,939,-360 from defendant Shenker;

(3) and restitution in the amount of $33,-939,360 from defendant I.J.K.

**B. Injunctive Relief.**—Defendants Morris A. Shenker, Murrieta Hot Springs, Sierra Charter Corp., and I.J.K. Nevada, Inc., are permanently enjoined from borrowing from, receiving an extension of credit from, or using the assets of an ERISA covered employee benefit plan.

58. The Secretary of Labor, on behalf of the Pension Trust, shall also recover interest on said amount from August 2, 1983, through the date of entry hereof, as follows:

(1) interest on the sum of $28,227,364 in accordance with the Second Addendum at the rate of 11 percent per annum, compounded monthly;

(2) interest on the sum of $1,881,600 in accordance with the $2 million Murrieta loan agreement at the rate of 10 percent per annum;

(3) and interest on the sum of $3,524,-222.98 at the rate of 7 percent per annum

in accordance with the Riverside County, California judgment and applicable California law.

59. The Secretary of Labor and the Pension Trust shall recover costs and attorney fees against defendants Sierra, Shenker, and I.J.K. jointly and severally, in such amounts as may subsequently be determined by the Court. *See* 29 U.S.C. sec. 1132(g)(1) (Supp. V 1981).

60. The entire amount of the judgment entered herein shall bear interest from the date of judgment as provided by law.

61. Defendants Sierra and Shenker shall take nothing under their counterclaims against the Pension Trust.

## XV. JUDGMENT ASSIGNED TO THE PENSION TRUST

62. The judgment entered in favor of the Secretary of Labor against defendants Shenker, I.J.K., and Sierra shall be immediately assigned to the Pension Trust. Provided, however, that the Secretary has all rights, powers, and capabilities of a judgment creditor, without limitation, to enforce and execute the judgment based on these findings of facts and conclusions of law.

## XVI. DEFENDANT BEN SCHMOUTEY

63. Defendant Ben Schmoutey breached his fiduciary duty while acting as a trustee of the Pension Trust in violation of ERISA, 29 U.S.C. secs. 1104(a)(1)(B)–(C), 1106(a)(1)(B), (D) (1976).

## XVII. FINDINGS OF FACT INCORPORATED BY REFERENCE

63. Any finding of fact appearing in these Conclusions of Law is by this reference incorporated into the Findings of Fact set forth above and is deemed to be a findings of fact.